IN THE COMMONWEALH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| The Union Labor Life Insurance Company, a Maryland corporation, on behalf of its Separate Account J. | : : : : | |
| v. | : : | No. 804 C.D. 2017 Argued: November 13, 2018 |
| Isle of Capri Associates, L.P., Isle of Capri Associates Horizon, L.P., and Isle of Capri Associates Tides, L.P. | : : : : | |
| Appeal of: Isle of Capri Associates, L.P. | : : | |

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION
BY PRESIDENT JUDGE LEAVITT                                    FILED: January 14, 2019

Isle of Capri Associates, L.P. (IOC) appeals an order of the Court of Common Pleas of Philadelphia County voiding IOC's sale of 91 parking licenses associated with a condominium project IOC developed.[1]  The court held that the parking garage licenses were mortgaged property subject to a receivership order and could not be sold without the approval of the court conducting the receivership proceeding.  For the following reasons, we affirm.

---

[1] IOC appealed the Court of Common Pleas of Philadelphia County's order to the Superior Court. By order dated April 26, 2017, the Superior Court transferred this matter to this Court, noting this Court has exclusive jurisdiction over proceedings related to not-for-profit corporations.  42 Pa. C.S. §762(a)(5).

## Background

The facts are undisputed.  In July 2006, IOC created a condominium complex, known as the Waterfront Square Condominium (Master Condominium), by recording a declaration of condominium (Master Declaration) under the Pennsylvania Uniform Condominium Act (Condominium Act).[2]  The Master Declaration provided for the development of five undeveloped pad sites, *i.e.*, Pad Units 1 to 5.  Phase I called for IOC's construction of two condominium towers, called the Peninsula and the Regatta, and a parking garage on Pad Units 1 and 2.  The Master Declaration provided that the parking garage was a common element of the Master Condominium and that IOC, as declarant, may grant parking licenses to the purchasers of the condominium units.  Phase II called for the construction of a tower, called the Reef, on Pad Unit 3 by a related entity, Isle of Capri Associates Reef, L.P. (IOC-Reef).  IOC planned to construct additional towers on Pad Units 4 and 5, to be known, respectively, as the Horizon and the Tides; these two pad sites were never developed.

In May of 2007, IOC borrowed $39,265,840 from Union Labor Insurance Company (Lender) to finance construction of the condominium complex.  The mortgage agreement identifies the "mortgaged property" as follows:

> 2.1.1  All that certain Pad Unit 3 (as defined in the [Master Declaration]) in the Master Condominium *and the undivided twenty percent (20%) ownership interest in the Common Elements appurtenant to Pad Unit 3* under the terms of the [Master Declaration], all as more particularly described in Exhibit "A" attached hereto and made a part hereof, upon which Mortgagor intends to construct a residential condominium project to be known as the Reef Condominium and Spa at

---

[2] 68 Pa. C.S. §§3101-3414.

Waterfront Square (hereinafter collectively referred to as the "Reef Pad Unit");

2.1.2 All that certain Pad Unit 4 (as defined in the [Master Declaration]) in the Master Condominium *and the undivided twenty percent (20%) ownership interest in the Common Elements appurtenant to Pad Unit 4* under the terms of the [Master Declaration], all as more particularly described in Exhibit "A" attached hereto and made a part hereof, upon which Mortgagor intends to construct a residential condominium project to be known as the Horizon Condominium and Spa at Waterfront Square (hereinafter collectively referred to as the "Horizon Pad Unit");

2.1.3 All that certain Pad Unit 5 (as defined in the [Master Declaration]) in the Master Condominium *and the undivided twenty percent (20%) ownership interest in the Common Elements appurtenant to Pad Unit 5* under the terms of the [Master Declaration], all as more particularly described in Exhibit "A" attached hereto and made a part hereof, upon which Mortgagor intends to construct a residential condominium project to be known as the Tide Condominium and Spa at Waterfront Square (hereinafter collectively referred to as the "Tide Pad Unit");

2.1.4 The Peninsula Units, *together with the undivided ownership in the Common Elements appurtenant to such Peninsula Units*, all as more particularly described in Exhibit "A" attached hereto and made a part hereof;

2.1.5 The Regatta Units*, together with the undivided ownership in the Common Elements appurtenant to such Regatta Units*, all as more particularly described in Exhibit "A" attached hereto and made a part hereof;

2.1.6 [A]ll structures, improvements, buildings and any additions and alterations thereto or replacements thereof, now or hereafter erected upon the Reef Pad Unit, the Horizon Pad Unit and the Tide Pad Unit (hereinafter collectively referred to as the "Master Condominium Units"), *including but not limited to parking facilities and other infrastructure*, or constructed within the

Peninsula Units or the Regatta Units (all of the foregoing being collectively referred to as the "Improvements") ...

* * *

2.1.12 *All of Mortgagor's right, title and interest in and to* all trade leases, subleases, lettings, *licenses* and other occupancy agreements, and guarantee thereof, for the Premises or any part thereof …

* * *

2.1.15 *All licenses*, permits, and warranties attributable or *allocable to all or any portion of the Premises*, both real and personal;

* * *

2.1.19 *All of Mortgagor's right, title and interest in and to the [Master Declaration]*, the Peninsula Condominium Declaration, the Regatta Condominium Declaration and any Declaration of Condominium hereafter recorded in connection with the Reef Pad Unit, the Horizon Pad Unit and/or the Tide Pad Unit … or any interest therein or rights thereunder, now owned or hereafter acquired.

IOC Mortgage Agreement at 4-7; Reproduced Record at 482a-485a (R.R. __) (emphasis added).

To finance Phase II of the construction, in November 2007, IOC-Reef borrowed $97,300,000 from Lender, secured by IOC-Reef's interest in the condominium complex. This included Pad Unit 3, the Reef Condominium units, and the associated common elements.

IOC and IOC-Reef defaulted on the loans. On September 26, 2011, Lender commenced two foreclosure actions in the Philadelphia County Court of Common Pleas. Against IOC, it sought $25,337,351.88, plus costs, taxes and

4

interest; against IOC-Reef it sought $79,020,015.54, plus costs, taxes and interest.[3]

That same day, Lender petitioned for the appointment of a receiver over the mortgaged property, *i.e.,* that real property and improvements "described on Exhibit A attached to the Mortgage." Certified Records (C.R.), Item 4, at 3. On December 19, 2011, the parties agreed to a receivership, and to have GH Property Management, LLC (Receiver) appointed to serve as the receiver.

On December 20, 2011, the Philadelphia County Court of Common Pleas approved the parties' agreement, which placed "all of the Mortgaged Property (as that term is defined in the Petition) in which [Lender] has a lien and/or security interest" into receivership. Receivership Order, 12/20/2011, at 1, ¶2; R.R. 558a. The receivership order appointed Receiver and stated, in pertinent part, as follows:

> Receiver shall, as of the date of this Order, enter upon, receive and take complete possession of all of the Mortgaged Property, including all personalty located thereon … and such other personalty as may be found thereon or off the Mortgaged Property which relate to the operation of all portions of the Mortgaged Property and which are subject to the security interest of [Lender], *including without limitation, all of [IOC]'s interest in the Condominium Associations*.

Receivership Order at 2, ¶3; R.R. 559a (emphasis added). The order directed Receiver to "perform a complete inventory of the Mortgaged Property coming under its control or possession under this appointment." *Id*. at 3, ¶8; R.R. 560a. Finally, the order enjoined IOC from "interfering in any way with the management of the

---

[3] IOC had conveyed portions of the mortgaged property to Isle of Capri Associates Horizon, L.P. (IOC-Horizon), and Isle of Capri Associates Tides, L.P. (IOC-Tides). At the time the foreclosure actions commenced, IOC-Horizon owned Pad Unit 4, and IOC-Tides owned Pad Unit 5; Lender did not release the mortgages on either pad site. Settlement Agreement at 5, ¶¶T-U; R.R. 1017a. Therefore, these two entities were also named as defendants in the foreclosure actions.

Mortgaged Property (including the sale or lease of the Units) or the Condominium Associations by Receiver until further order of this Court." *Id*. at 5, ¶12; R.R. 562a.

In February 2012, Lender, IOC, and IOC-Reef entered into an agreement (Settlement Agreement) to settle the foreclosure actions with the entry of a consent judgment and Lender's foreclosure on the mortgaged property. The Settlement Agreement included a general release, which states in pertinent part:

> Provided that [IOC and IOC-Reef] fully cooperate with [Lender] in the Foreclosure Actions as provided herein, upon completion of the Foreclosure Actions, in consideration of the promises and covenants of [IOC and IOC-Reef] set forth herein, [Lender] on behalf of itself, its agents, servants, officers, directors, shareholders, employees, affiliated entities and persons, successors and assigns, does hereby release, remise and forever discharge [IOC and IOC-Reef] … from any and all claims, demands, controversies, causes of action, suits, judgments, and debts….

Settlement Agreement at 10, ¶3.2; R.R. 1022a.

On February 17, 2012, the Philadelphia County Court of Common Pleas entered a consent judgment against IOC in the foreclosure action in the amount of $25,337,351.88, plus costs, taxes and interest. The court also entered a consent judgment against IOC-Reef in the amount of $79,020,015.54, plus costs, taxes and interest. Subsequently, in March 2012, writs of execution were filed, and a sheriff's sale was scheduled for June 5, 2012. Specifically, the notices of the sheriff's sale described the following property for sale:

> The Reef Condominium and Spa at Waterfront Square, 901 Penn Street, Philadelphia, Pennsylvania 19123; Units Nos.: F 201, 202, 203, 204, 205, 206 & 207; F 301, 305, 306 & 307; F 401, 403, 404, 405, 406, 407, 408 & 409; F 501, 503, 505, 506, 507, 508, 509 & 510; F 601, 605, 606, 607, 608 & 609; F 701, 705,

6

706, 707 & 708; F 801, 805, 806, 808 & 810; F 902 & 906; F 1003 & 1004; F 1101, 1103, 1104, 1106, 1107, 1108, 1109 & 1110; F 1201, 1205, 1206, 1207, 1208, 1209 & 1210; F 1303, 1304, 1305, 1306, 1309 & 1310; F 1403, 1404, 1408, 1409 & 1410; F 1501, 1502, 1503, 1504, 1505, 1506, 1507, 1508, 1509 & 1510; F 1601, 1603, 1604, 1605, 1606, 1607, 1608 & 1610; F 1702, 1703, 1704, 1705, 1706, 1707, 1708 & 1709; F 1803, 1804, 1805, 1806, 1807, 1808 & 1809; F 1902, 1903, 1904, 1905, 1907 & 1909; F 2001, 2002, 2003, 2006 & 2007; F 2101 & 2102

* * *

The Regatta Condominium and Spa at Waterfront Square, Unit R 2801, 901 Penn Street; 901 Penn Street, Pad Unit 4 (Horizon), Waterfront Square Condominium; 901 Penn Street, Pad Unit 5 (Tides), Waterfront Square Condominium, Philadelphia, Pennsylvania 19123.

R.R. 1068a-1069a; R.R. 1076a.

On May 15, 2012, prior to the sheriff's sale, IOC sold 91 parking licenses, identified as Nos. 0863 through 0953, to Gior, L.P. (Gior), an affiliate of IOC,[4] for $215,000. Gior is the owner of a commercial unit in the Reef Condominium.

On June 5, 2012, at the sheriff's sale, Waterfront Square Reef, LLC (Waterfront) purchased Regatta Condominium Unit R 2801, the undeveloped Pad Units 4 and 5, and over 100 units in the Reef Condominium. In both foreclosure actions, Lender assigned its claims to Waterfront. After the sheriff's sale, IOC-Reef sold 88 parking licenses to Gior.

In October 2013, Gior and IOC-Reef initiated an action against Waterfront, Waterfront Square Condominium Association (Association) and

_____

[4] Both Gior and IOC are controlled by Doron Gelfand and Arthur Ruppin.

7

Receiver in the Commerce Court, a division of the Philadelphia County Court of Common Pleas,[5] to validate Gior's ownership of the parking licenses it purchased from IOC and IOC-Reef. Waterfront, the Association and Receiver filed a motion for summary judgment asserting that IOC and IOC-Reef lacked the power to transfer the parking licenses and their attempt to do so violated the receivership order. In its counterclaim, Waterfront asserted that it owned all of the parking licenses sold by IOC and IOC-Reef to Gior.

## Commerce Court Decision

On August 31, 2015, the Commerce Court granted the motion for summary judgment with respect to the 88 parking licenses that IOC-Reef sold after the sheriff's sale.[6] The Commerce Court reasoned that the right of IOC and IOC-Reef to issue parking licenses was a "special declarant right" that terminated at the foreclosure sale. Commerce Court Order, 8/31/2015, at 1 n.1; R.R. 671a-672a. The Commerce Court denied summary judgment with regard to the 91 licenses IOC transferred to Gior prior to the sheriff's sale, concluding that there were unresolved factual issues. The Commerce Court concluded that "the receivership court" was the proper forum to address the transfer of the 91 parking licenses. *Id.* at 2 n.1; R.R. 672a. Lender, Waterfront and Receiver then filed a motion in the receivership

---

[5] The Philadelphia Commerce Court Case Management Program (Commerce Court) is a specialized civil program of the Trial Division of the Philadelphia County Court of Common Pleas. *See* http://www.courts.phila.gov/common-pleas/trial/civil/units/commerce-program.asp (last visited December 18, 2018).

[6] The Commerce Court's ruling on IOC-Reef's sale of the 88 parking licenses to Gior is not at issue in this appeal. Instead, Gior and IOC-Reef challenged this part of the Commerce Court's ruling in a different appeal. *See Gior G.P., Inc. v. Waterfront Square Reef, LLC*, ___A.3d ___ (Pa. Cmwlth., No. 805 C.D. 2017, filed January 14, 2019).

8

proceeding (Receivership Court) to void the transfer of the 91 parking licenses in the IOC foreclosure action.

## Receivership Court Decision

The Receivership Court heard oral argument on December 18, 2015. Lender, Waterfront and Receiver argued that the 91 parking licenses were part of the mortgaged property subject to the receivership order. IOC's transfer of the parking licenses without permission of the Receivership Court violated the receivership order, and, thus, the licenses held by Gior were null and void.

In response, IOC argued that the Master Declaration gave IOC, as declarant, the power to issue parking licenses to condominium unit owners, such as Gior. IOC simply exercised that power when it sold the 91 parking licenses. IOC further argued that Lender, Waterfront and Receiver were barred by the doctrines of estoppel and laches to challenge the sale of the 91 parking licenses because they waited years to file their motion in the receivership proceeding. Further, the release provision in the Settlement Agreement also barred their challenge.

By order of April 18, 2016, the Receivership Court granted the motion to void the transfer of the 91 parking licenses. In support, it relied upon the mortgage agreement, which states that the mortgaged property includes (1) the physical structure of the parking garage; (2) the undivided interests in the parking garage as a common element; (3) parking licenses; (4) any right, title or interest in any parking license; and (5) the specific right to grant a parking license as permitted by the Master Declaration. Receivership Court op. at 14; R.R. 1842a. The Receivership Court also concluded that IOC could not sell the 91 parking licenses because its authority to issue parking licenses was a special declarant right that terminated "not only at the time of the Sheriff's Sale, per [Commerce Court's] decision, but also at

9

least prior to the date of the transfer to Gior." *Id.* at 16 (citing 68 Pa. C.S. §3304(d)(regarding rights of a declarant following foreclosure and other proceedings)); R.R. 1844a. The Receivership Court further held that the Settlement Agreement did not prevent Lender from seeking relief because IOC did not "fully cooperate" in the foreclosure actions. *Id.* at 16-17; R.R. 1844a-1845a; Settlement Agreement at 10, ¶3.2; R.R. 1022a. Finally, the Receivership Court rejected IOC's argument that the doctrines of estoppel and laches barred the application to void the transfer of the 91 parking licenses.

IOC appealed to this Court.

## Appeal

On appeal,[7] IOC raises three issues for our consideration.[8] It first argues that the Receivership Court erred in holding that the 91 parking licenses were subject to the receivership proceeding. Second, it argues that the Receivership Court erred because the motion to void the transfer of the 91 parking licenses was barred by the doctrines of estoppel and laches. Third, it argues that the Settlement Agreement barred Lender from challenging the transfer. We address these issues *seriatim*.

---

[7] When reviewing the decision of a trial court in a non-jury trial, the appellate court must determine whether the findings of facts are supported by competent evidence and whether the trial court committed an error of law. *Centennial Station Condominium Association v. Schaefer Company Builders, Inc.*, 800 A.2d 379, 382 n.1 (Pa. Cmwlth. 2002).

[8] We reordered IOC's issues to facilitate our review. On appeal, IOC does not challenge the Receivership Court's ruling that IOC's right to issue parking licenses was a special declarant right under the Condominium Act, which had terminated at the time IOC transferred the 91 parking licenses to Gior. We do not address the Receivership Court's ruling in this regard.

## I.  Scope of Receivership Proceeding

IOC argues that the 91 parking licenses were not subject to the receivership proceeding because the receivership ended on June 5, 2012, the date of the sheriff's sale. Receiver lacked any authority to hold or transfer parking licenses after that date. The Master Declaration provides that only the owners or tenants of condominium units can be granted parking licenses. Neither Lender, Waterfront nor Receiver owned a unit when they filed the instant motion to void the transfer of the 91 parking licenses.

The transfer of the 91 parking licenses to Gior took place on May 15, 2012, prior to the sheriff's sale and at a time that the receivership proceeding was active. Accordingly, the termination of the receivership at the sheriff's sale is immaterial. It is likewise immaterial that none of the moving parties owned a condominium unit in May 2012. They did not seek ownership of the 91 parking licenses; rather, they sought to void IOC's transfer of those licenses.

The documentary evidence supports the Receivership Court's conclusion that the parking licenses were mortgaged property. The mortgage agreement encumbered pad units, condominium units, and the associated common elements which, according to the Master Declaration, include the parking garage. The mortgage agreement also encumbered licenses that are "attributable or allocable to all or any portion of the Premises" as well as IOC's "right, title and interest in and to the [Master Declaration]." R.R. 482a, 484a. One right in the Master Declaration so encumbered was IOC's right, as declarant, to grant parking licenses to condominium unit owners for consideration. In short, the relevant documents fully support the Receivership Court's holding that the parking garage, the licenses to the

11

parking garage, and IOC's right to issue those licenses constituted mortgaged property.

IOC argues, alternatively, that the 91 parking licenses were not subject to the receivership order. Notably, the receivership order states that Receiver "shall, as of the date of this Order, enter upon, receive and take complete possession" of all of the mortgaged property, "including without limitation, all of [IOC's and IOC-Reef's] interest in the Condominium Associations." Receivership Order ¶3; R.R. 559a. The term "mortgaged property" was defined in Lender's petition for appointment of a receiver as certain real property and improvements "described on Exhibit A attached to the Mortgage." C.R., Item 4, at 3.

In turn, Exhibit A of the mortgage agreement described the following real property and improvements:

Premises A

* * *

Pad Unit 3 (Reef) *together with a proportionate undivided 20% interest in the Common Elements (as defined in such Declaration).*

Pad Unit 4 (Horizon) *together with a proportionate undivided 20% interest in the Common Elements (as defined in such Declaration).*

Pad Unit 5 (Tides) *together with a proportionate undivided 20% interest in the Common Elements (as defined in such Declaration).*

* * *

Premises B (UNSOLD UNITS OF The Peninsula Condominium and Spa at Waterfront Square)

12

ALL THOSE CERTAIN units in the property known, named and identified as The Peninsula Condominium and Spa at Waterfront Square … Unit Numbers: 2501 and 2502, [ ] *together with a proportionate undivided interest in the Common Elements for each unit (as defined in such Declaration)*

Premises C (UNSOLD UNITS OF The Regatta Condominium and Spa at Waterfront Square)

ALL THOSE CERTAIN units in the property known, named and identified as The Regatta Condominium and Spa at Waterfront Square … Unit Numbers: 301, 2702, 2801, 2901 and 2902, *together with a proportionate undivided interest in the Common Elements for each unit (as defined in such Declaration).*

R.R. 534a (emphasis added). In short, "mortgaged property" included the "Common Elements for each unit"; the parking garage is a "common element" specified in the Master Declaration. We conclude that the 91 parking licenses were part of the mortgaged property subject to the receivership, as the Receivership Court correctly held.

A receiver is an officer and agent of the court with the "usual and ordinary duty of a receiver" to sell property on the court's order. *Lewistown Trust Company v. Nestler*, 167 A. 354, 355 (Pa. 1933) (A receiver's "acts with regard to the property in his custody, when authorized, are the acts of the court in whose hands, in contemplation of law, the property actually is."). Here, the receivership order required IOC to "forthwith surrender possession of the Mortgaged Property" and enjoined IOC from "interfering in any way with the management of the Mortgaged Property." Receivership Order ¶¶12, 13; R.R. 562a. Because IOC transferred the 91 parking licenses without seeking the Receivership Court's permission, it violated the receivership order.

## II. Doctrines of Laches and Estoppel

IOC argues, next, that Lender and Receiver waived their right to challenge the May 2012 transfer of the 91 parking licenses because they waited almost four years before filing their motion to void that transfer in the receivership proceeding. According to IOC, on May 17, 2012, it notified Lender and Receiver of the pending sale of the parking licenses, but they took no action. Further, Lender and Receiver "consistently acted in a way" that demonstrated their belief that the parking licenses were not subject to the receivership order. IOC Brief at 31. Particularly, the notices of the sheriff's sale did not list the parking licenses. IOC contends that the sheriff's sale transferred only undeveloped pad units and unsold condominium units, not "intangible rights" such as parking licenses. IOC Brief at 33.

Lender, Waterfront and Receiver respond that IOC's unlawful transfer of the 91 parking licenses cannot be ratified by inaction. Estoppel requires detrimental reliance on another party's "words, deeds or representation;" mere silence or inaction is insufficient. Lender Brief at 50. In any event, IOC's letter of May 17, 2012, noting IOC's intention to sell parking licenses, was sent "after the fact." Lender Brief at 48.

We begin with IOC's proposition that Lender and Receiver waived their claims to the parking licenses because they did not list them in the sheriff's notice for sale or the writs of execution. Section 3105(a) of the Condominium Act states that "each unit *together with its common element interest* constitutes for all purposes a separate parcel of real estate." 68 Pa. C.S. §3105(a) (emphasis added). Section 3204 further states:

14

> After the declaration is recorded, a description of a unit which sets forth the name of the condominium, the recording data for the declaration, the county or counties in which the condominium is located and the identifying number of the unit is a sufficient legal description of that unit and its common element interest *even if the common element interest is not described or referred to therein.* Deeds, leases and mortgages of units shall be recorded in the same records as are maintained by the recorder for the recording of like instruments and shall be indexed by the recorder in the same manner as like instruments are indexed.

68 Pa. C.S. §3204 (emphasis added). Stated otherwise, interests in the common elements transfer automatically with the sale of the condominium unit. It is not necessary to describe the common element interests in the instrument conveying title to that unit. *See* 68 Pa. C.S. §3204, Uniform Law Comment 2. The sheriff's sale disposed of the undeveloped pad units and condominium units and the common elements associated with them.

IOC's argument on abandonment likewise lacks merit. Property is not abandoned unless its owner voluntarily and intentionally relinquishes all rights to that property. *In re Funds in Possession of Conemaugh Township Supervisors*, 724 A.2d 990, 993 (Pa. Cmwlth. 1999). Abandonment requires intent, "together with external acts by which such intention is carried into effect." *Buffalo v. Jones*, 813 A.2d 659, 664 (Pa. 2002). There is no evidence either Lender or Receiver intended to abandon their property rights in the mortgaged properties, *i.e.*, the parking garages and parking licenses.

In support of its estoppel argument, IOC cites *Erie Telecommunications, Inc. v. City of Erie*, 659 F. Supp. 580 (W.D. Pa. 1987). There, the United States District Court stated that the "doctrine of quasi-estoppel operates to bar a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by that party." *Id.* at 585. The District Court explained

15

that, "[i]n common parlance, this doctrine translates into 'one cannot blow both hot and cold.'" *Id*.

Here, the record lacks any evidence that Lender or Receiver ever acted in a way that was "inconsistent with a position previously taken by [either of them]." *Id*. Although neither responded to IOC's letter of May 17, 2012, noting IOC's intention to sell parking licenses, inaction does not trigger estoppel. *See Farmers Trust Company v. Bomberger*, 523 A.2d 790, 794 (Pa. Super. 1987) ("As a general rule, mere silence or inaction is not a ground for estoppel unless there is a duty to speak or act."). We reject IOC's estoppel argument.

Finally, IOC asserts that the parties' motion to enforce the injunction provisions in the receivership order was filed four years too late and, thus, barred by the doctrine of laches. Lender, Waterfront and Receiver respond that IOC was in no way prejudiced by this sequence of events.

The doctrine of laches is "an equitable bar to the prosecution of stale claims and is the practical application of the maxim that 'those who sleep on their rights must awaken to the consequence that they have disappeared.'" *Kern v. Kern*, 892 A.2d 1, 9 (Pa. Super. 2005) (quoting *Jackson v. Thomson*, 53 A. 506, 506 (Pa. 1902)). Our Supreme Court has explained the doctrine of laches as follows:

> Laches bars relief when the complaining party is guilty of want of due diligence in failing to promptly institute the action to the prejudice of another. Thus, in order to prevail on an assertion of laches, respondents must establish: a) a delay arising from petitioner's failure to exercise due diligence; and, b) prejudice to the respondents resulting from the delay. Moreover, the question of laches is factual and is determined by examining the circumstances of each case.

*Sprague v. Casey*, 550 A.2d 184, 187-88 (Pa. 1988) (citations omitted). Moreover,

16

> [t]he party asserting laches as a defense must present evidence demonstrating prejudice from the lapse of time. Such evidence may include establishing that a witness has died or become unavailable, that substantiating records were lost or destroyed, or that the defendant has changed his position in anticipation that the opposing party has waived his claims.

*Fulton v. Fulton*, 106 A.3d 127, 131 (Pa. Super. 2014) (citations omitted) (citing *Commonwealth ex rel. Baldwin v. Richard*, 751 A.2d 647, 651 (Pa. 2000)). The question of whether laches applies is a question of law. *United National Insurance Company v. J.H. France Refractories Company*, 668 A.2d 120, 124 n.4 (Pa. 1995).

Here, IOC sold the 91 parking licenses to Gior on May 15, 2012, after the Receivership Court appointed Receiver on December 20, 2011, but before the sheriff's sale on June 5, 2012. In October 2013, Gior initiated an action against Waterfront and Receiver in the Commerce Court to determine the validity of their parking licenses. Waterfront and Receiver filed a counterclaim and a motion for summary judgment to void the sale of the parking licenses. The parties litigated the validity of IOC's transfer until the Commerce Court ruled that the matter belonged in the receivership proceeding. Thereafter, Lender, Waterfront and Receiver filed their motion to void the transfer, and it was granted on April 18, 2016.

The motion to void IOC's transfer of the 91 parking licenses to Gior was filed three years after the transfer occurred. During that period of time, the validity of the transfer of those parking licenses was vigorously litigated in the Commerce Court. It was this litigation, instituted by Gior, that delayed the filing of the instant motion. Given these circumstances, we agree with the Receivership Court that the doctrine of laches did not bar the instant challenge to IOC's sale of the 91 parking licenses. Notably, IOC does not argue that it was prejudiced by the alleged "lapse of time." Rather, it argues that the transfer had "the acquiescence of

17

all other parties." IOC Brief at 33. The ongoing litigation in the Commerce Court belies that claim.

### III. The Settlement Agreement

Finally, IOC argues that the Receivership Court erred by failing to give effect to the Settlement Agreement that Lender, IOC, and IOC-Reef entered in February of 2012. The Settlement Agreement includes a release, which states in pertinent part:

> *Provided that [IOC and IOC-Reef] fully cooperate with [Lender] in the Foreclosure Actions as provided herein*, upon completion of the Foreclosure Actions, in consideration of the promises and covenants of [IOC and IOC-Reef] set forth herein, [Lender] on behalf of itself, its agents, servants, officers, directors, shareholders, employees, affiliated entities and persons, successors and assigns, does hereby release, remise and forever discharge [IOC and IOC-Reef] … from any and all claims, demands, controversies, causes of action, suits, judgments, and debts….

Settlement Agreement at 10, ¶3.2; R.R. 1022a (emphasis added). IOC argues that the above-stated release barred Lender from filing its motion to void IOC's transfer of the 91 parking licenses. The Receivership Court held that because IOC did not "fully cooperate" with Lender in the foreclosure actions, the release provision did not prevent Lender and Receiver from seeking their requested relief. We agree and so conclude.

### Conclusion

IOC's transfer of the 91 parking licenses without seeking the Receivership Court's approval violated the receivership order. Lender and Receiver's motion to void IOC's transfer of the 91 parking licenses was not barred

18

by the doctrines of laches or estoppel, and the Settlement Agreement did not bar the motion filed by Lender and Receiver. Accordingly, we hold that the parking garage, the licenses to the parking garage, and IOC's right to issue those licenses constituted mortgaged property that was subject to the receivership order. Accordingly, we affirm the Receivership Court's order of April 18, 2016.

_____
MARY HANNAH LEAVITT, President Judge

IN THE COMMONWEALH COURT OF PENNSYLVANIA

The Union Labor Life Insurance : 
Company, a Maryland corporation, : 
on behalf of its Separate Account J. : 
                                 : 
        v.               :   No. 804 C.D. 2017
                                   : 
Isle of Capri Associates, L.P., Isle of : 
Capri Associates Horizon, L.P., and : 
Isle of Capri Associates Tides, L.P. : 
                                   : 
Appeal of: Isle of Capri Associates, : 
L.P.                                : 

# **O R D E R**

       AND NOW, this 14th day of January, 2019, the order of the Court of Common Pleas of Philadelphia County dated April 18, 2016, in the above-captioned matter is AFFIRMED.

                                        _____

                                        MARY HANNAH LEAVITT, President Judge