# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Gior G.P., Inc., the General Partner of : 
and trading as Gior, LP, Piers 36-39 : 
North Management Reef, Inc., the : 
General Partner of and trading as Isle : 
of Capri Associates Reef, LP, : 
             Appellants : 
              : 
        v. : No. 805 C.D. 2017
              : Argued:  November 13, 2018
Waterfront Square Reef, LLC, : 
Waterfront Square Condominium : 
Association, GH Property : 
Management, LLC : 
              : 
        v. : 
              : 
Isle Capri Associations, LP : 

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION
BY PRESIDENT JUDGE LEAVITT               FILED: January 14, 2019

       Gior G.P., Inc., the general partner of Gior, L.P. (Gior), and Piers 36-39 North Management Reef, Inc., the general partner of Isle of Capri Associates Reef, L.P. (IOC-Reef), appeal an order of the Court of Common Pleas of Philadelphia County granting summary judgment to Waterfront Square Reef, LLC (Waterfront), Waterfront Square Condominium Association (Association), and GH Property Management, LLC.[1]  In so ruling, the court held that Gior did not hold an

---

[1] Gior and IOC-Reef appealed the Court of Common Pleas of Philadelphia County's order to the Superior Court.  By order dated April 26, 2017, the Superior Court transferred this matter to this Court, noting this Court has exclusive jurisdiction over proceedings related to not-for-profit corporations.  42 Pa. C.S. §762(a)(5).

ownership interest in certain parking licenses associated with a condominium project, which were sold by IOC-Reef after the condominium was foreclosed. For the following reasons, we affirm.

## Background

The facts are undisputed. In July 2006, Isle of Capri Associates, L.P. (IOC) created a condominium complex, known as the Waterfront Square Condominium (Master Condominium), by recording a declaration of condominium (Master Declaration) under the Pennsylvania Uniform Condominium Act (Condominium Act).[2] The Master Declaration provided for the development of five undeveloped pad sites, *i.e.*, Pad Units 1 to 5. Phase I called for IOC's construction of two condominium towers, called the Peninsula and the Regatta, and a parking garage on Pad Units 1 and 2. The Master Declaration provided that the parking garage was a common element of the Master Condominium and that IOC, as declarant, or "the declarant of such residential condominiums, if not [IOC]," may grant parking licenses to the purchasers of the condominium units. Reproduced Record at 33a (R.R. __). Phase II called for the construction of a tower, called the Reef, on Pad Unit 3 by IOC-Reef. In April 2009, IOC-Reef recorded a declaration under the Condominium Act for the Reef Condominium (Reef Declaration). IOC planned to construct additional towers on Pad Units 4 and 5, to be known, respectively, as the Horizon and the Tides; these two pad sites were never developed.

In May 2007, IOC borrowed $39,265,840 from Union Labor Life Insurance Company (Lender) to finance construction of the condominium complex. The mortgage agreement (IOC Mortgage Agreement) identifies "mortgaged property" as follows:

---

[2] 68 Pa. C.S. §§3101-3414.

2.1.1   All that certain Pad Unit 3 (as defined in the [Master Declaration]) in the Master Condominium *and the undivided twenty percent (20%) ownership interest in the Common Elements appurtenant to Pad Unit 3* under the terms of the [Master Declaration], all as more particularly described in Exhibit "A" attached hereto and made a part hereof,[3] upon which Mortgagor intends to construct a residential condominium project to be known as the Reef Condominium and Spa at Waterfront Square (hereinafter collectively referred to as the "Reef Pad Unit");

2.1.2   All that certain Pad Unit 4 (as defined in the [Master Declaration]) in the Master Condominium *and the undivided twenty percent (20%) ownership interest in the Common*

---

[3] Exhibit A of the IOC Mortgage Agreement describes the following real property and improvements:

Premises A

\* \* \*

Pad Unit 3 (Reef) *together with a proportionate undivided 20% interest in the Common Elements (as defined in such Declaration).*

Pad Unit 4 (Horizon) *together with a proportionate undivided 20% interest in the Common Elements (as defined in such Declaration).*

Pad Unit 5 (Tides) *together with a proportionate undivided 20% interest in the Common Elements (as defined in such Declaration).*

\* \* \*

Premises B (UNSOLD UNITS OF The Peninsula Condominium and Spa at Waterfront Square)

ALL THOSE CERTAIN units in the property known, named and identified as The Peninsula Condominium and Spa at Waterfront Square … Unit Numbers: 2501 and 2502, [] *together with a proportionate undivided interest in the Common Elements for each unit (as defined in such Declaration)*

Premises C (UNSOLD UNITS OF The Regatta Condominium and Spa at Waterfront Square)

ALL THOSE CERTAIN units in the property known, named and identified as The Regatta Condominium and Spa at Waterfront Square … Unit Numbers: 301, 2702, 2801, 2901 and 2902, *together with a proportionate undivided interest in the Common Elements for each unit (as defined in such Declaration).*

R.R. 480a (emphasis added).

*Elements appurtenant to Pad Unit 4* under the terms of the [Master Declaration], all as more particularly described in Exhibit "A" attached hereto and made a part hereof, upon which Mortgagor intends to construct a residential condominium project to be known as the Horizon Condominium and Spa at Waterfront Square (hereinafter collectively referred to as the "Horizon Pad Unit");

2.1.3   All that certain Pad Unit 5 (as defined in the [Master Declaration]) in the Master Condominium *and the undivided twenty percent (20%) ownership interest in the Common Elements appurtenant to Pad Unit 5* under the terms of the [Master Declaration], all as more particularly described in Exhibit "A" attached hereto and made a part hereof, upon which Mortgagor intends to construct a residential condominium project to be known as the Tide Condominium and Spa at Waterfront Square (hereinafter collectively referred to as the "Tide Pad Unit");

2.1.4  The Peninsula Units, *together with the undivided ownership in the Common Elements appurtenant to such Peninsula Units*, all as more particularly described in Exhibit "A" attached hereto and made a part hereof;

2.1.5  The Regatta Units*, together with the undivided ownership in the Common Elements appurtenant to such Regatta Units*, all as more particularly described in Exhibit "A" attached hereto and made a part hereof;

2.1.6 [A]ll structures, improvements, buildings and any additions and alterations thereto or replacements thereof, now or hereafter erected upon the Reef Pad Unit, the Horizon Pad Unit and the Tide Pad Unit (hereinafter collectively referred to as the "Master Condominium Units"), *including but not limited to parking facilities and other infrastructure*, or constructed within the Peninsula Units or the Regatta Units (all of the foregoing being collectively referred to as the "Improvements") …

* * *

4

2.1.12 *All of Mortgagor's right, title and interest in and to* all trade leases, subleases, lettings, *licenses* and other occupancy agreements, and guarantee thereof, for the Premises or any part thereof …

\* \* \*

2.1.15 *All licenses*, permits, and warranties attributable or *allocable to all or any portion of the Premises*, both real and personal;

\* \* \*

2.1.19 *All of Mortgagor's right, title and interest in and to the [Master Declaration]*, the Peninsula Condominium Declaration, the Regatta Condominium Declaration and any Declaration of Condominium hereafter recorded in connection with the Reef Pad Unit, the Horizon Pad Unit and/or the Tide Pad Unit … or any interest therein or rights thereunder, now owned or hereafter acquired.

IOC Mortgage Agreement at 4-7; R.R. 429a-432a (emphasis added).

To finance Phase II of the construction, in November 2007, IOC-Reef borrowed $97,300,000 from Lender, secured by IOC-Reef's interest in the condominium complex. This included Pad Unit 3; the Reef Condominium units; the associated common elements; and IOC-Reef's "right, title and interest in and to the Master [] Declaration and all other Condominium Documents." IOC-Reef Mortgage Agreement at 6; R.R. 495a.

IOC and IOC-Reef defaulted on the loans. On September 26, 2011, Lender commenced two foreclosure actions in the Philadelphia County Court of Common Pleas. Against IOC, it sought $25,337,351.88, plus costs, taxes and interest; against IOC-Reef it sought $79,020,015.54, plus costs, taxes and interest.[4]

---

[4] IOC had conveyed portions of the mortgaged property to IOC-Horizon and IOC-Tides. At the time the foreclosure actions commenced, IOC-Horizon owned Pad Unit 4, and IOC-Tides owned

That same day, Lender petitioned for the appointment of a receiver over the mortgaged property. On December 19, 2011, the parties agreed to a receivership, and to have GH Property Management, LLC (Receiver) appointed to serve as the receiver.

On December 20, 2011, the Philadelphia County Court of Common Pleas approved the parties' agreement, which placed "all of the Mortgaged Property (as that term is defined in the Petition [for Appointment of a Receiver])[5] in which [Lender] has a lien and/or security interest" into receivership. Receivership Order, 12/20/2011, at 1, ¶2; R.R. 224a, 235a. The receivership order appointed Receiver and stated, in pertinent part, as follows:

> Receiver shall, as of the date of this Order, enter upon, receive and take complete possession of all of the Mortgaged Property, including all personalty located thereon … and such other personalty as may be found thereon or off the Mortgaged Property which relate to the operation of all portions of the Mortgaged Property and which are subject to the security interest of [Lender], *including without limitation, all of [IOC and IOC-Reef's] interest in the Condominium Associations*.

Receivership Order at 2, ¶3; R.R. 225a, 236a (emphasis added). The order directed Receiver to "perform a complete inventory of the Mortgaged Property coming under its control or possession under this appointment." *Id*. at 3, ¶8; R.R. 226a, 237a. The order further enjoined IOC and IOC-Reef from "interfering in any way with the

Pad Unit 5; Lender did not release the mortgages on either pad site. Settlement Agreement at 5, ¶¶T-U; R.R. 208a. Therefore, these two entities were also named as defendants in the foreclosure actions.

[5] Lender's petition for appointment of a receiver is not included in the original record. However, IOC-Reef and Gior do not dispute that the term "mortgaged property" defined in the petition for appointment of a receiver incorporated the "mortgaged property" defined in the IOC Mortgage Agreement and IOC-Reef Mortgage Agreement. Gior Brief at 18. *See also* IOC-Reef and Gior's Amended Complaint at 10, ¶51; R.R. 10a.

management of the Mortgaged Property (including the sale or lease of the Units) or the Condominium Associations by Receiver until further order of this Court." *Id*. at 5, ¶12; R.R. 228a-229a, 239a.

In February 2012, Lender, IOC, and IOC-Reef entered into an agreement (Settlement Agreement) to settle the foreclosure actions with the entry of a consent judgment and Lender's foreclosure on the mortgaged property. The Settlement Agreement included a general release, which states in pertinent part:

> Provided that [IOC and IOC-Reef] fully cooperate with [Lender] in the Foreclosure Actions as provided herein, upon completion of the Foreclosure Actions, in consideration of the promises and covenants of [IOC and IOC-Reef] set forth herein, [Lender] on behalf of itself, its agents, servants, officers, directors, shareholders, employees, affiliated entities and persons, successors and assigns, does hereby release, remise and forever discharge [IOC and IOC-Reef] … from any and all claims, demands, controversies, causes of action, suits, judgments, and debts….

Settlement Agreement at 10, ¶3.2; R.R. 213a.

On February 17, 2012, the Philadelphia County Court of Common Pleas entered a consent judgment against IOC in the foreclosure action in the amount of $25,337,351.88, plus costs, taxes and interest. The court also entered a consent judgment against IOC-Reef in the amount of $79,020,015.54, plus costs, taxes and interest. Subsequently, in March 2012, writs of execution were filed, and a sheriff's sale was scheduled for June 5, 2012. Specifically, the notices of the sheriff's sale described the following property for sale:

> The Reef Condominium and Spa at Waterfront Square, 901 Penn Street, Philadelphia, Pennsylvania 19123; Units Nos.: F 201, 202, 203, 204, 205, 206 & 207; F 301, 305, 306 & 307; F 401, 403, 404, 405, 406, 407, 408 & 409; F 501, 503, 505, 506, 507,

7

508, 509 & 510; F 601, 605, 606, 607, 608 & 609; F 701, 705, 706, 707 & 708; F 801, 805, 806, 808 & 810; F 902 & 906; F 1003 & 1004; F 1101, 1103, 1104, 1106, 1107, 1108, 1109 & 1110; F 1201, 1205, 1206, 1207, 1208, 1209 & 1210; F 1303, 1304, 1305, 1306, 1309 & 1310; F 1403, 1404, 1408, 1409 & 1410; F 1501, 1502, 1503, 1504, 1505, 1506, 1507, 1508, 1509 & 1510; F 1601, 1603, 1604, 1605, 1606, 1607, 1608 & 1610; F 1702, 1703, 1704, 1705, 1706, 1707, 1708 & 1709; F 1803, 1804, 1805, 1806, 1807, 1808 & 1809; F 1902, 1903, 1904, 1905, 1907 & 1909; F 2001, 2002, 2003, 2006 & 2007; F 2101 & 2102

* * *

The Regatta Condominium and Spa at Waterfront Square, Unit R 2801, 901 Penn Street; 901 Penn Street, Pad Unit 4 (Horizon), Waterfront Square Condominium; 901 Penn Street, Pad Unit 5 (Tides), Waterfront Square Condominium, Philadelphia, Pennsylvania 19123.

R.R. 259a-260a; R.R. 266a-267a.

On May 15, 2012, prior to the sheriff's sale, IOC sold 91 parking licenses, Nos. 0863 through 0953, to Gior, an affiliate of IOC,[6] for $215,000. Gior is the owner of a commercial unit in the Reef Condominium.

On June 5, 2012, at the sheriff's sale, Waterfront purchased Regatta Condominium Unit R 2801, the undeveloped Pad Units 4 and 5, and over 100 units in the Reef Condominium. In both foreclosure actions, Lender assigned its claims to Waterfront. After the sheriff's sale, IOC-Reef sold 88 parking licenses to Gior.

In October 2013, Gior and IOC-Reef initiated an action against Waterfront, the Association, and Receiver in the Commerce Court, a division of the Philadelphia County Court of Common Pleas,[7] to validate Gior's ownership of the

---

[6] Both Gior and IOC are controlled by Doron Gelfand and Arthur Ruppin.

[7] The Philadelphia Commerce Court Case Management Program (Commerce Court) is a specialized civil program of the Trial Division of the Philadelphia County Court of Common Pleas.

parking licenses it purchased from IOC and IOC-Reef. Waterfront, the Association, and Receiver filed a motion for summary judgment asserting that IOC and IOC-Reef lacked the power to transfer the parking licenses and that their attempt to do so violated the receivership order. In its counterclaim, Waterfront asserted that it owned all of the parking places transferred to Gior by IOC and IOC-Reef.

## Commerce Court Decision

By order of August 31, 2015, the Commerce Court granted the motion for summary judgment with respect to the 88 parking licenses that IOC-Reef sold after the sheriff's sale. The Commerce Court reasoned that the right of IOC and IOC-Reef to issue parking licenses "was a special declarant right that terminated at the foreclosure sale and fell within the definition of Mortgaged Property." Commerce Court Order, 8/31/2015, at 1-2 n.1; R.R. 4121a-4122a. The Commerce Court denied summary judgment with regard to the 91 licenses that IOC transferred to Gior prior to the foreclosure sale, concluding that there were unresolved factual issues. The Commerce Court concluded that "the receivership court" was the proper tribunal to address the factual issues surrounding the 91 parking licenses. *Id.* at 2 n.1; R.R. 4122a. Lender, Waterfront and Receiver then filed a motion in the receivership proceeding (Receivership Court) to void the transfer of the 91 parking licenses.

## Receivership Court Decision

On April 18, 2016, the Receivership Court granted the motion to void the transfer of the 91 parking licenses as violative of the receivership order. In support, the Receivership Court relied upon the IOC Mortgage Agreement, which stated that the mortgaged property includes (1) the physical structure of the parking

---

*See* http://www.courts.phila.gov/common-pleas/trial/civil/units/commerce-program.asp (last visited December 18, 2018).

9

garage; (2) the undivided interests in the parking garage as a common element; (3) parking licenses; (4) any right, title or interest in any parking license; and (5) the specific right to grant a parking license as permitted by the Master Declaration. Receivership Court op. at 14. As such, the Receivership Court held that IOC could not transfer the 91 parking licenses without court approval in the receivership proceeding. On May 16, 2016, IOC and its affiliates appealed the Receivership Court's decision regarding the transfer of the 91 parking licenses.[8]

Following the April 18, 2016, Receivership Court order, the parties stipulated that the remaining claims before the Commerce Court should be dismissed so that the Commerce Court's grant of summary judgment with respect to the 88 parking licenses could be appealed. On July 20, 2016, the Commerce Court signed the stipulation and order,[9] and Gior and IOC-Reef appealed.

### Commerce Court 1925(a) Opinion

In support of its August 31, 2015, order, the Commerce Court filed an opinion pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure, PA. R.A.P. 1925(a). The court explained that under the Superior Court's decision in *MetroClub Condominium Association v. 201-59 North Eighth Street Associates, L.P.*, 47 A.3d 137 (Pa. Super. 2012) (*MetroClub*), IOC and IOC-Reef's right to issue parking licenses was a special declarant right that terminated at the foreclosure sale.

---

[8] *See The Union Labor Life Insurance Company v. Isle of Capri Associates, L.P.*, ___ A.3d ___ (Pa. Cmwlth., No. 804 C.D. 2017, filed January 14, 2019).

[9] The stipulation and order stated that the August 31, 2015, Commerce Court order dismissing Gior and IOC-Reef's claims as to the 88 parking licenses and the April 18, 2016, Receivership Court order voiding and vacating Gior's 91 parking licenses rendered Waterfront, the Association, and Receiver's counterclaim "moot, provided that there is no reversal, modification or remand." Stipulation and Order, 7/20/2016, at 2; R.R. 4160a. Accordingly, the Commerce Court dismissed the counterclaim without prejudice. The stipulation and order further stated that the dismissal of the counterclaims and the April 18, 2016 Receivership Court order rendered the August 31, 2015 Commerce Court order a "final order" within the meaning of PA. R.A.P. 341. *Id.* at 2; R.R. 4160a.

It further noted that a Uniform Law Comment states that the list of special declarant rights set forth in Section 3103 of the Condominium Act is not exclusive. Commerce Court 1925(a) opinion at 16-18 (quoting 68 Pa. C.S. §3103, Uniform Law Comment 13).

The Commerce Court explained that the parking licenses were mortgaged property subject to the receivership order. Specifically, Section 2.1.19 of the IOC Mortgage Agreement provides that mortgaged property included "[a]ll of [IOC's] right, title and interest in and to the Master [] Declaration … or any interest therein or rights thereunder, now owned or hereafter acquired." Commerce Court 1925(a) opinion at 16-18 (citing R.R. 431a-432a). The Master Declaration further provided that IOC, as declarant, or "the declarant of such residential condominiums, if not [IOC]," may grant parking licenses to the purchasers of the condominium units. R.R. 33a. Simply, the sheriff's sale on June 5, 2012, divested IOC and IOC-Reef of all their interest in the mortgaged property, including the parking garage and the right to issue licenses to the garage.

**Appeal**

On appeal,[10] Gior and IOC-Reef raise two issues for our consideration. First, they argue that the Commerce Court erred in determining that IOC and IOC-Reef's interest in issuing parking licenses was a special declarant right under the Condominium Act. Second, they argue that the Commerce Court erred in holding

---

[10] This Court's standard of review of a grant of summary judgment is *de novo*, and our scope of review is plenary. We apply the same standard for summary judgment as the trial court. *Cochrane v. Kopko*, 975 A.2d 1203, 1205 (Pa. Cmwlth. 2009). A grant of summary judgment is only appropriate where the record clearly shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Farabaugh v. Pennsylvania Turnpike Commission*, 911 A.2d 1264, 1267 n.3 (Pa. 2006).

that the parking licenses and the right to issue such licenses were mortgaged property subject to the receivership in the foreclosure action.

## I. Special Declarant Rights

Gior and IOC-Reef argue that the Commerce Court erred in its interpretation of the meaning of "special declarant rights" under the Condominium Act. They contend that IOC-Reef's right to issue parking licenses under the Master Declaration was not a special declarant right but rather an "ownership right," which does not fall within the scope of Section 3103 of the Condominium Act. Gior Brief at 37.

We begin with an examination of Section 3103 of the Condominium Act, which defines "special declarant rights" as "[r]ights reserved for the benefit of a declarant" to:

(1) Complete improvements indicated on plats and plans filed with the declaration (section 3210).

(2) Convert convertible real estate in a flexible condominium (section 3211).

(3) Add additional real estate to a flexible condominium (section 3211).

(4) Withdraw withdrawable real estate from a flexible condominium (section 3212).

(5) Convert a unit into two or more units, common n elements, or into two or more units and common elements (section 3215).

(6) Maintain offices, signs and models (section 3217).

(7) Use easements through the common elements for the purpose of making improvements within the condominium or within any convertible or additional real estate (section 3218).

(8) Cause the condominium to be merged or consolidated with another condominium (section 3223).

(9) Make the condominium subject to a master association (section 3222).

(10) Appoint or remove any officer of the association or any master association or any executive board member during any period of declarant control (section 3303(c)).

68 Pa. C.S. §3103. The comment provided by the National Conference of Commissioners on Uniform State Laws explains that the definition,

> "special declarant rights," seeks to isolate those rights reserved for the benefit of a declarant which are unique to the declarant and not shared in common with other unit owners. *The list, while short, encompasses virtually every significant right which a declarant might seek in the course of creating or expanding a condominium.*

68 Pa. C.S. §3103, Uniform Law Comment 13 (emphasis added).[11] Under Section 3103, special declarant rights are unique to the declarant and not shared with other

---

[11] *See,* JOINT STATE GOVERNMENT COMMISSION, *Condominiums: A New Generation - Proposing the Uniform Act with Modifications*, at 9 (September 1978) ("Since 45 sections of the [model act of the Condominium Act] are incorporated without change, the comments of the National Conference of Commissioners on Uniform State Laws will generally be helpful in the application of the [Condominium Act]."). Indeed, the definition of "special declarant rights" was incorporated into the Condominium Act verbatim.

> Further, Section 1939 of the Statutory Construction Act of 1972 provides that:
>> The comments or reports of the commission, committee, association or other entity which drafted a statute may be consulted in the construction or application of the original provisions of the statute if such comments or report were published or otherwise generally available prior to the consideration of the statute by the General Assembly, but the text of the statute shall control in the event of conflict between its text and such comments or report.

1 Pa. C.S. §1939.

owners; further, the list in Section 3103 is not exhaustive but includes "every significant right" a declarant might use to create a condominium. *Id.*

In *MetroClub*, 47 A.3d 137, a condominium association brought a declaratory judgment action against a condominium developer, which was no longer in control of the association but owned condominium units and asserted control over unallocated parking spaces. The condominium association claimed that the declaration, which gave the developer control over unassigned parking spaces, was invalid. The Superior Court rejected that claim, holding that the developer's right to control unallocated parking spaces, although not expressly listed in Section 3103 of the Condominium Act, was a special declarant right because the list in Section 3103 was not exhaustive.

Likewise, the right of IOC and IOC-Reef to issue parking licenses was reserved to them as the declarants, "which are unique to [IOC and IOC-Reef] and not shared in common with other unit owners." 68 Pa. C.S. §3103, Uniform Law Comment 13. IOC and IOC-Reef's interest in issuing parking licenses is a special declarant right under Section 3103 of the Condominium Act.

Nevertheless, Gior and IOC-Reef argue that the Master Declaration gave IOC and IOC-Reef an ownership interest in "intangible personal property," which must be distinguished from "special declarant rights" in Section 3103 of the Condominium Act. Gior Brief at 38. In support, Gior and IOC-Reef direct the Court to *Mayflower Square Condominium Association v. KMALM, Inc.*, 724 A.2d 389 (Pa. Cmwlth. 1999) (*Mayflower*).

In *Mayflower*, the condominium association brought an action against a successor declarant to recover unpaid monthly fees and assessments for the maintenance of the garage, which included spaces assigned to proposed townhouse

14

units that had not yet been built. The successor declarant argued that it was not obligated to pay these charges because "it only acquired a successor declarant status, not the ownership of the twelve townhouse units." *Id.* at 392. The declaration made each parking space in the garage a limited common element when it was assigned to a townhouse unit. In holding that the successor declarant was obligated to pay for the maintenance of the parking spaces, this Court explained as follows:

> Section 3304(c) of the [Condominium] Act, 68 Pa. C.S. §3304(c), provides that in case of sale by a bankruptcy trustee, a person acquiring title to the units succeeds to "all special declarant rights" upon request. Our review of the June 4, 1991 Agreement of Sale and the February 10, 1992 Assignment indicates that *the bankruptcy trustee assigned the special declarant rights reserved by [the original declarant] in the [d]eclaration to [the successor declarant].* However, *[the successor declarant] totally disregards the fact that it acquired not only the special declarant rights but also the title to the twelve townhouse units and the exclusive right to use the parking spaces* designated for those units by accepting the 1992 deed. Even assuming *arguendo* that the twelve parking spaces have never been allocated to either the [a]ssociation or [the successor declarant], as [the successor declarant] asserts, [the successor declarant] would be still liable for the parking space expenses as a successor declarant under … the [d]eclaration.

*Id.* at 394 (emphasis added).

Gior and IOC-Reef argue that by virtue of the above-quoted passage, this Court has "recognized that the ownership rights to the parking spaces – which, according to the [Master] Declaration here took the form of the right to issue Parking Licenses – were separate and apart from the 'special declarant rights' identified in [the Condominium Act]." Gior Brief at 39. Stated otherwise, they contend that the Master Declaration gave IOC and IOC-Reef ownership of the right to issue parking spaces, which they describe as a form of intangible personal personalty. We

15

disagree. *Mayflower* is limited to its facts; the issue decided in that case was whether the successor declarant was liable for the maintenance of a parking garage that had been built in advance of the townhouse units assigned to that garage. The successor declarant owned those yet-to-be constructed townhouse units and the parking spaces appurtenant thereto. We held, accordingly, that the successor declarant was liable for the maintenance of the garage because of its status both as declarant and as owner of the 12 townhouse units for which the parking spaces had been designated. *Mayflower* did not establish, as Gior and IOC-Reef argue, that the right to issue parking licenses is personal property that can be separated from the real property that makes up the condominium and its common elements.

Further, this argument of Gior and IOC-Reef ignores the language of the Master Declaration, which provides in pertinent part:

> (b) If residential condominiums are constructed on the Pad Units, [IOC] (or the declarant of such residential condominiums, if not [IOC]) may grant Parking Licenses to the purchasers of Residential Units and Commercial Units in the condominiums developed on the Pad Units. *When each buyer of a Residential Unit or Commercial Unit in a Building is conveyed title to its Unit, that buyer may receive a non-exclusive license to park one car in the Parking Garage (a "Parking License") for no additional consideration. The Declarant reserves the right to grant to buyers of Units Parking Licenses for no consideration, and reserves the right to grant to the buyers of certain Units one or more additional Parking Licenses for additional consideration ….*
>
> (c) *The holders of Parking Licenses must be owners or tenants of Units ….*

Master Declaration, Section 4.4(b); R.R. 33a (emphasis added). This language establishes that the ownership of the parking spaces belongs to condominium unit

16

owners. The parking garage is a common element specified under Section 4.4(a) of the Master Declaration, which is "intended to be used in common by all residents of the Pad Units." R.R. 29a, 33a. As declarants, IOC and IOC-Reef had the right to issue parking licenses to condominium unit purchasers who needed to access the parking garage. The right to issue parking licenses derived from the Master Declaration and is a special declarant right; it is not an intangible personal property interest.

In dismissing Gior's claim as to the 88 parking licenses transferred from IOC-Reef after the sheriff's sale, the Commerce Court held that IOC-Reef's special declarant rights, including its right to issue parking licenses, terminated at the foreclosure sale. We agree. Section 3304(d) of the Condominium Act states in pertinent part:

> Upon foreclosure, tax sale, judicial sale, sale by a trustee under a deed of trust or sale under 11 U.S.C. (relating to bankruptcy) or receivership or similar proceedings of all units and other real estate in a condominium owned by a declarant: (1) the declarant ceases to have any special declarant rights….

68 Pa. C.S. §3304(d). The sheriff's sale, which occurred in June of 2012, terminated all of IOC-Reef's special declarant rights, including the right to transfer 88 parking licenses to Gior.

## II. Mortgaged Property

Gior and IOC-Reef argue, next, that Gior's ownership of the parking licenses and IOC-Reef's right to issue those parking licenses were not mortgaged property because they were not included in either of the Mortgage Agreements. Section 2.1.15 of the IOC Mortgage Agreement and Section 2.1.12 of the IOC-Reef Mortgage Agreement stated that licenses "attributable or allocable to all or any

17

portion of the Premises" are mortgaged property, but licenses that are acquired or created in the future are not included. R.R. 431a, 495a. Further, the right to issue parking licenses falls within the scope of "permitted exceptions" to the definition of "mortgaged property," as provided under Section 2.1 in both Mortgage Agreements. R.R. 432a, 495a. Gior and IOC-Reef argue that in construing the Mortgage Agreements, the Commerce Court failed to consider the parties' course of conduct over four years, during which the parties never treated parking license rights as mortgaged property. They further argue that the Commerce Court failed to construe ambiguities in favor of Gior and IOC-Reef, which did not draft the Mortgage Agreements.

The documentary evidence supports the Commerce Court's conclusion that the parking licenses and the right to issue such licenses were mortgaged property. Both Mortgage Agreements encumbered pad units, condominium units, and the associated common elements which, according to the Master Declaration, include the parking garage. The mortgaged property also includes IOC and IOC-Reef's "right, title and interest in and to all trade leases, subleases, lettings, licenses and other occupancy agreements" as well as their "right, title and interest in and to the [Master Declaration]." R.R. 431a-432a, 494a-495a. One right so encumbered was the declarant's right to issue parking licenses to condominium unit owners for consideration. In short, the relevant documents fully support the Commerce Court's holding that the parking garage, the licenses to the parking garage, and IOC and IOC-Reef's right to issue those licenses constituted mortgaged property. The foreclosure divested IOC and IOC-Reef of any interest in the parking garage, including the right to issue parking licenses.

18

A receiver is considered an officer and agent of the court that appoints the receiver, and it is a "usual and ordinary duty of a receiver" to sell property on the court's order. *Lewistown Trust Company v. Nestler*, 167 A. 354, 355 (Pa. 1933) ("A receiver is an executive officer of the court which appoints him, and his acts with regard to the property in his custody, when authorized, are the acts of the court in whose hands, in contemplation of law, the property actually is."). Here, the receivership order provided that Receiver "shall, as of the date of this Order, enter upon, receive and take complete possession" of all of the mortgaged property, "including without limitation, … all of [IOC and IOC-Reef's] interest in the Condominium Associations." Consent Order ¶3; R.R. 225a, 236a. The receivership order also required IOC and IOC-Reef to "forthwith surrender possession of the Mortgaged Property" and enjoined IOC and IOC-Reef from "interfering in any way with the management of the Mortgaged Property." Consent Order ¶¶12, 13; R.R. 228a-229a, 239a. These requirements were violated when IOC transferred the 91 parking licenses to Gior before the foreclosure sale without seeking the Receivership Court's approval.

Alternatively, Gior and IOC-Reef argue that the right to issue parking licenses falls within the scope of "permitted exceptions" to the definition of "mortgaged property," as provided under Section 2.1 in both Mortgage Agreements. R.R. 432a. Section 2.1 states in pertinent part:

> TO HAVE AND TO HOLD the Mortgaged Property unto Mortgagee and its substitutes or successors forever, and Mortgagor does hereby bind itself, its successors, assigns, executors and administrators to warrant and forever defend all and singular the Mortgaged Property unto Mortgagee, its successors and assigns, against every person whomsoever lawfully claiming or to claim an interest in the same, or any part thereof. *Subject only to (i) the specific matters, if any, set forth*

19

> *in Exhibit B attached hereto and hereby made a part hereof and any future matters approved in writing by Mortgagee as Permitted Exceptions (collectively, "Permitted Exceptions"),* and (ii) any other future matters expressly permitted hereunder.

R.R. 432a, 495a (emphasis added). Exhibit B of the Mortgage Agreements, in turn, provides that "[t]erms, conditions, restrictions, and obligations" created by the Master Declaration is a "permitted exception." R.R. 482a, 540a.

Gior and IOC-Reef contend that one of the "terms, conditions, and obligations" under the Master Declaration relates to the issuance of the parking licenses. Gior Brief at 44. This argument lacks merit. The Master Declaration did not obligate IOC and IOC-Reef to issue parking licenses; rather, it states that they "*may* grant Parking Licenses to the purchasers of Residential Units and Commercial Units." R.R. 33a (emphasis added). In short, the "permitted exceptions" language quoted above relates to the mortgagor's obligation to defend on behalf of the mortgagee against any claim relating to the mortgaged property. It does not provide an exception to the definition of "mortgaged property."

Gior and IOC-Reef argue that the Commerce Court erred by ignoring the parties' course of conduct over four years, during which time the parties never treated parking licenses as mortgaged property. They also assert that the Commerce Court should have construed ambiguities in the definition of "mortgaged property" in favor of Gior and IOC-Reef, and it did not. We disagree.

The fundamental rule in construing a contract is to ascertain and give effect to the intention of the parties. *Lower Frederick Township v. Clemmer*, 543 A.2d 502, 510 (Pa. 1988). "The intention of the parties must be ascertained from the document itself, if its terms are clear and unambiguous." *Sun Company, Inc. (R&M) v. Pennsylvania Turnpike Commission*, 708 A.2d 875, 878 (Pa. Cmwlth.

20

1998). A contract is ambiguous if it is "reasonably susceptible of different constructions and capable of being understood in more than one sense." *Id*. A determination of whether a contract is ambiguous is a question of law. *Id*. The course of conduct of a party is relevant in interpreting a contract "and may be the strongest indication of the intention of the parties to the contract." *Id.* at 880 (citing *Atlantic Richfield Company v. Razumic*, 390 A.2d 736 (Pa. 1978)).

The definition of "mortgaged property" in the IOC and IOC-Reef Mortgage Agreements is not ambiguous. It is clear as a bell. The Mortgage Agreements identify the parking garage, the licenses to the parking garage, and the right to issue those licenses as mortgaged property. Therefore, the Commerce Court need not have considered the course of conduct to ascertain the intention of the parties to the Mortgage Agreements.

## Conclusion

IOC-Reef's interest in issuing parking licenses was a special declarant right within the meaning of Section 3103 of the Condominium Act, which terminated upon foreclosure pursuant to Section 3304(d) of the Condominium Act. Further, licenses in the parking garage constituted mortgaged property under both Mortgage Agreements and any transfer thereof was subject to the receivership order. The June 5, 2012, foreclosure divested IOC and IOC-Reef of any interest in the parking garage, including the right to issue parking licenses.

We hold that the Commerce Court did not err by granting summary judgment to Waterfront, the Association, and Receiver with respect to the 88 parking licenses that IOC-Reef sold to Gior after the sheriff's sale. Accordingly, we affirm the Commerce Court's August 31, 2015, order.

_____
MARY HANNAH LEAVITT, President Judge

21

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Gior G.P., Inc., the General Partner of  :
and trading as Gior, LP, Piers 36-39     :
North Management Reef, Inc., the         :
General Partner of and trading as Isle   :
of Capri Associates Reef, LP,            :
                  Appellants  :
                                         :
                v.  :  No. 805 C.D. 2017
                                         :
Waterfront Square Reef, LLC,             :
Waterfront Square Condominium            :
Association, GH Property                 :
Management, LLC                          :
                                         :
                v.  :
                                         :
Isle Capri Associations, LP              :

## **O R D E R**

        AND NOW, this 14th day of January, 2019, the order of the Court of
Common Pleas of Philadelphia County dated August 31, 2015, in the above-
captioned matter is AFFIRMED.

                                              _____

                                              MARY HANNAH LEAVITT, President Judge