# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Michael A. Kadar-Kallen and    :
Kimberlee Kadar-Kallen    :
      :  No.  1671 C.D. 2019
    v.    :
      :  Argued: September 17, 2020
Old Iron Estates Homeowners    :
Association,    :
      Appellant    :

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
       HONORABLE J. ANDREW CROMPTON, Judge
       HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

OPINION BY
JUDGE McCULLOUGH         FILED:  December 3, 2020

Old Iron Estates Homeowners Association (Association)[1] appeals from the October 17, 2019 order of the Dauphin County Court of Common Pleas granting summary judgment in favor of Plaintiffs Michael and Kimberlee Kadar-Kallen (the Kadar-Kallens), and denying the Association's cross-motion for summary judgment. The trial court concluded that the Kadar-Kallens' property is not subject to the Association's restrictions, covenants, and conditions, that the Kadar-Kallens are not members of the Association, and that they are not obligated to pay fees to the Association. We affirm in part, reverse in part, and remand for further proceedings.

---

[1] The Association is organized as a nonprofit corporation under the Nonprofit Corporation Law of 1988, 15 Pa.C.S. §§ 5101-6162. This Court thus has jurisdiction over the Association's appeal pursuant to 42 Pa.C.S. §762(a)(5).

## Background

Michael Kevin Ricker (Ricker) sought to develop the land that would come to be known as Old Iron Estates in four phases. On April 14, 2003, Ricker recorded the Phase I Final Subdivision Plan for Old Iron Estates (Phase I Plan) with the Dauphin County Recorder of Deeds. (Kadar-Kallens' Motion for Summary Judgment, Exhibit B; Association's Br. at Tab A; Reproduced Record (R.R.) at 47a-51a (Phase I Plan).) The Phase I Plan is recorded at Plan Book O, Volume 8, Pages 22-26. The Phase I Plan refers to a "Total Tract Area" of 91.027 acres, but details only the "Phase I Area," which is composed of 29.0781 acres, and states that the "Total Number of Proposed Lots" would be 31. (Phase I Plan at 1.) The ensuing pages of the Phase I Plan provide detailed images of the boundaries of each lot that would be included within Phase I, but provide neither an illustration nor legal description of any property that would be included within subsequent phases of the development. The Phase I Plan did not purport to create a planned community or to establish a homeowners' association, but the general notes on its first page state that "Lot 58 shall be owned and maintained by a Homeowners' Association" and similarly provide that "[t]he proposed medians shall be maintained by a Homeowners' Association." *Id.* The Phase I Plan does not include any additional information about the Association.

Intending to establish a planned community that would be governed by a homeowners' association, on May 12, 2003, Ricker recorded the Old Iron Estates, A Planned Community, Restrictions, Covenants and Conditions. (Kadar-Kallens' Motion for Summary Judgment, Exhibit C; Association's Br. at Tab A; R.R. at 53a-61a (Phase I Covenants).) On its face, this document applies to "P/O Parcels 35-066-008 & 35-066-013," and provides as follows:

> NOW, THEREFORE, KNOW ALL MEN BY THESE
> PRESENTS that Michael Kevin Ricker (the "Declarant")

2

does hereby covenant and declare that it shall hold and stand seized and shall convey the lands composing the Planned Community subject to the following Restrictions, Covenants and Conditions which shall run with the land composing the Planned Community and shall be binding upon Declarant, its successors and assigns and upon all land included within the Planned Community as described on the Final Subdivision Plan for Old Iron Estates, Lower Paxton Township, Dauphin County, dated March 20, 2002, revised February 18, 2003 and recorded with the Office of the Recorder of Deeds of Dauphin County in Plan Book "O", Volume 8, Pages 22-26, inclusive, for Phase I, which Restrictions, Covenants and Conditions are hereby imposed for equal benefit of each owner of each and every Unit . . . situate in the Planned Community.

Phase I Covenants at 1.

Ricker recorded Final Subdivision Plans for Phase IV, Phase III, and Phase II on May 4, 2004, August 6, 2004, and June 17, 2008, respectively. (Trial Court Opinion, 10/21/2019 (Tr. Ct. Op.), at 3.) He later recorded additional restrictions, covenants, and conditions for each phase, which are materially similar to the Phase I Covenants, but facially apply to their respective phases of the development. Relevant here, Ricker recorded the Old Iron Estates, A Planned Community, Restrictions, Covenants and Conditions Phase III (Phase III Covenants) on January 31, 2012. *Id.* at 4. The Phase III Covenants provide a list of parcels to which they apply, including Parcel No. 35-066-317.

Parcel No. 35-066-317 is described as Lot 41 in Phase III of the development, and is numbered as 6439 McCormick Lane, Harrisburg (Property). The central difficulty in this dispute arises from the fact that Ricker did not own the Property at the time that he recorded the Phase III Covenants. Ricker had deeded his entire interest in the Property to John Fox on October 27, 2005. (Tr. Ct. Op. at 3.) Fox then deeded his entire interest in the Property to the Kadar-Kallens on February 28, 2007.

3

*Id.* Neither deed references the Association nor suggests that the Property is subject to the Association's covenants. Additionally, neither deed expressly conveys a right to the owner of the Property to use common areas in the development.

The Kadar-Kallens initiated the instant litigation on December 21, 2017, by filing a complaint seeking a declaratory judgment that they are not members of the Association and that the Property is not subject to the Association's covenants. Following discovery, both parties moved for summary judgment. The Kadar-Kallens contended that Ricker's various filings failed to satisfy the requirements of the Uniform Planned Community Act[2] (UPCA) with respect to the Property, and that Ricker had no authority to bind the Property to the Phase III Covenants in 2012 when he no longer held its title.[3] The Association, by contrast, asserted that Ricker created a planned community under the UPCA via the Phase I Covenants, that the Phase I Covenants apply to all four phases of the development, and that the Kadar-Kallens had both actual and constructive notice of the Association's existence when they purchased the Property. In support of its assertion of notice, the Association highlighted the Kadar-Kallens' payment of an initiation fee and dues to the Association when they purchased the Property, the inclusion of a notice in their agreement of sale that the Property is part of a planned community, their completion of a Planned United Development (PUD) rider when they obtained their mortgage and another PUD rider when they refinanced that mortgage, and a reference to the Association in their title insurance commitment and policy. The Association further contended that the Phase III Covenants were a

---

[2] 68 Pa.C.S. §§5101-5414.

[3] The Kadar-Kallens further argued that, even if they are deemed to be members of the Association, they do not owe annual assessments under the UPCA for any year in which the Association did not adopt an annual budget. Having granted summary judgment in favor of the Kadar-Kallens on their primary contentions, the trial court did not reach this question.

4

mere amendment to the Phase I Covenants, rather than an attempt to impose new obligations upon property that Ricker no longer owned.

After hearing oral argument on April 15, 2019, the trial court granted summary judgment in favor of the Kadar-Kallens based upon the undisputed timeline of the pertinent factual events. The trial court emphasized that, under the UPCA, a "planned community may be created . . . only by recording a declaration executed in the same manner as a deed by all persons whose interests in the real estate will be conveyed." (Tr. Ct. Op. at 5 (quoting 68 Pa.C.S. §5201).) The court further emphasized the portions of the Uniform Law Comment accompanying the UPCA, which state that "[a] planned community is created . . . only by recording a declaration" and "[u]ntil the recordation of the document . . . the planned community has not been created." *Id.* (quoting 68 Pa.C.S. §5201 cmt. 1 & cmt. 2). When the Kadar-Kallens purchased the Property from Fox in 2007, only the Phase I Covenants appeared of record, but the Property is located in Phase III. *Id.* at 5-6. Ricker did not record the Phase III Covenants until 2012—five years after the Kadar-Kallens purchased the Property. Because only an individual holding a present interest in real estate can convey that real estate to a planned community under the UPCA, the trial court concluded that Ricker had no authority to encumber the Property when he recorded the Phase III Covenants.

The trial court rejected the Association's argument that the Phase III Covenants were merely an amendment to the Phase I Covenants, noting that the UPCA provides a procedure for amendment of declarations, and that there was no evidence suggesting compliance with that provision. *Id.* at 6 (citing 68 Pa.C.S. §5219(d)). The court declined to excuse the asserted procedural defects in light of the Kadar-Kallens' notice of the existence of a planned community when they purchased the Property.

5

Citing *Deep Meadows Civic Association v. Trusello*, 140 A.3d 60 (Pa. Cmwlth. 2016), the trial court opined that it would not impute notice where the Kadar-Kallens' deed does not reference the existence of a homeowners' association or any obligation to pay assessments. (Tr. Ct. Op. at 6.)[4] Accordingly, the trial court granted the Kadar-Kallens' motion for summary judgment and entered an order stating that the Property is subject to neither the Phase III Covenants nor any of the other restrictions, covenants, or conditions for any phase within the development.

The Association filed a motion for reconsideration limited to the issue of fees. The Association noted that, in denying it summary judgment, the trial court did not address the Association's argument that, notwithstanding the enforceability of any restrictive covenants, the Kadar-Kallens remain liable for the fees that the Association assesses for the management and maintenance of common areas in the development. The Kadar-Kallens opposed the Association's motion, contending that their deed grants them no right to use common areas and, thus, that they are not obligated to pay for any share of the maintenance costs for those areas. The trial court denied the Association's motion for reconsideration.

The Association appealed the trial court's order to this Court.[5] The Association presents three interrelated issues, asserting that the trial court erred in

---

[4] The trial court additionally rejected the Association's suggestion that the Kadar-Kallens' action was barred by the doctrine of laches because the Kadar-Kallens did not initiate this action until 2017. (Tr. Ct. Op. at 7.) The Association mentions the trial court's rejection of its laches argument in a footnote at the end of its brief to this Court, but it did not pursue a laches theory in its statement of the questions presented.

[5] "This Court's standard of review of a grant of summary judgment is *de novo*, and our scope of review is plenary. We apply the same standard for summary judgment as the trial court." *Gior G.P., Inc. v. Waterfront Square Reef, LLC*, 202 A.3d 845, 852 n.10 (Pa. Cmwlth. 2019) (citing *Cochrane v. Kopko*, 975 A.2d 1203, 1205 (Pa. Cmwlth. 2009)). "A grant of summary judgment is only appropriate where the record clearly shows that there are no genuine issues of material fact and **(Footnote continued on next page…)**

6

concluding that the Property is not subject to the Phase I Covenants recorded in 2003, that the court similarly erred in finding that the Kadar-Kallens are consequently not members of the Association and are not obligated to pay the Association's annual fees, and that, based upon the undisputed facts of record, the Association is entitled to judgment as a matter of law without a remand to the trial court.

## Discussion

### A. The Parties' Arguments

The Association contends that Old Iron Estates is a "planned community" under the UPCA, formed when Ricker recorded the Phase I Covenants in 2003. (Association's Br. at 22.) Notwithstanding the Property's location in Phase III of the development, the Association contends that the Property is subject to the Phase I Covenants. It emphasizes the portions of the Phase I Covenants which state that its provisions are "binding upon all land" and apply to "each and every unit," thereby expressing Ricker's intent that they should apply to all property encompassed within Old Iron Estates. *Id.* at 22, 27-28. The Association acknowledges that the Phase I Covenants refer to the Phase I Plan, but it asserts that, although the Phase I Plan details "the 29-acre portion of the planned community the declarant planned to develop during Phase I," it also "identifies the extent of Old Iron Estates consisting of 90+ total acres." *Id.* at 25.[6]

---

that the moving party is entitled to judgment as a matter of law." *Id.* (citing *Farabaugh v. Pennsylvania Turnpike Commission*, 911 A.2d 1264, 1267 n.3 (Pa. 2006)).

[6] The Association also includes a document entitled "Phasing Plan" in its brief, which contains an illustration of the boundaries of all four phases of the development. (Association's Br. at Tab A.) The Association asks this Court to take judicial notice of this document. The Kadar-Kallens challenge this request, noting that the Phasing Plan was not recorded with the Recorder of Deeds, was not part **(Footnote continued on next page…)**

7

The Association argues that Ricker's filings should be construed in the same manner as a contract and, thus, that we must seek to ascertain Ricker's intent. *Id.* at 26. Ricker's intent, the Association maintains, was to create a single planned community and one association to govern it, notwithstanding the phased implementation of the development plans. Apart from its invocation of Ricker's presumed intent, however, the Association argues that the Phase I Covenants are "clear and unambiguous" in their application to all real estate within Old Iron Estates, including the Kadar-Kallens' Property. *Id.* at 28. The Association reiterates that the Phase I Covenants state that they apply to the "lands composing the Planned Community," that they "shall run with the land composing the Planned Community," and that they are "imposed for equal benefit of each owner of each and every unit . . . situate in the Planned Community." *Id.* at 28-29. The Association further contends that, independent of the UPCA, the Phase I Covenants would be sufficient to bind all properties in the development as a matter of common law. *Id.* at 30-33.

As before the trial court, the Association further relies upon evidence suggesting that the Kadar-Kallens had both actual and constructive knowledge of the existence of the Association when they purchased the Property. The Kadar-Kallens' agreement of sale provided a notice that the Property is part of a planned community, and the phrase "100 yr. fee" was handwritten underneath, along with the Kadar-

---

of the record before the trial court, and was not included in the original record or the reproduced record on appeal. (Kadar-Kallens' Br. at 10.) The Phasing Plan merely provides an illustration of the entirety of the Old Iron Estates development. The plans for each phase are separately recorded with the Dauphin County Recorder of Deeds and are included in the original record as exhibits to the Kadar-Kallens' motion for summary judgment. Thus, we find the Phasing Plan to be a useful reference, having compiled certain information found elsewhere in the record. However, to the extent that the Association asks us to utilize the Phasing Plan to interpret the Phase I Plan or Phase I Covenants, we decline to do so. We will construe the relevant documents based upon their contents, not by reference to an extra-record illustration.

8

Kallens' initials. *Id.* at 35. The Kadar-Kallens signed a PUD alongside their mortgage, and a second PUD when they refinanced in 2009, both of which also state that the Property is part of a planned community. *Id.* at 35-36. Further, the Kadar-Kallens paid an initiation fee to the Association when they purchased the Property. Finally, the documents produced by the Kadar-Kallens' title insurer refer to the Phase I Covenants. *Id.* at 36-37. In light of these documents, the Association contends that the Kadar-Kallens possessed both actual and constructive knowledge that the Property was subject to the Association and to its covenants.

The Association appears to concede that Ricker lacked authority to dictate terms and conditions governing the Property in 2012, having sold it to Fox in 2005. Nonetheless, because the Association maintains that the Phase I Covenants were sufficient to bind the Property, it argues that the Phase III Covenants were "irrelevant" as a matter of law. *Id.* at 46. Ricker's "only transgression," the Association suggests, was that "he *over*-recorded in an abundance of caution." *Id.* at 47 (emphasis in original).

Even if not bound by the Phase I Covenants or the Phase III Covenants, the Association argues that, due to their knowledge of the Association when they purchased the Property, the Kadar-Kallens are obligated to pay annual assessments to the Association so as to cover their share of the ownership and maintenance of common areas. *Id.* at 43-44. The Association cites *Hess v. Barton Glen Club, Inc.*, 718 A.2d 908 (Pa. Cmwlth. 1998), and *Wag-Myr Woodlands Homeowners Association v. Guiswite*, 197 A.3d 1243 (Pa. Super. 2018), for the proposition that homeowners in a planned community have an obligation to share in the costs to maintain common areas. (Association's Br. at 43-44.) This must be so, the Association reasons, because all property owners in the community benefit from such common areas, and it would be

9

unfair to require other property owners to subsidize the share of those who do not contribute. *Id.* at 44 (citing *Spinnler Point Colony Association, Inc. v. Nash*, 689 A.2d 1026 (Pa. Cmwlth. 1997); *Fogarty v. Hemlock Farms Community Association, Inc.*, 685 A.2d 241 (Pa. Cmwlth. 1996); *Meadow Run and Mountain Lake Park Association v. Berkel*, 598 A.2d 1024 (Pa. Super. 1991)).

The Association further takes issue with the trial court's reliance upon and application of *Deep Meadows*. Although this Court in *Deep Meadows* held that a homeowner was not liable to a homeowners' association for fees where his deed neither referenced the association nor granted him the right to use common areas, *Deep Meadows*, 140 A.3d at 68-69, the Association observes that the homeowner in *Deep Meadows* had no notice whatsoever that his property was subject to a homeowners' association. Here, by contrast, the Association relies upon the evidence of the Kadar-Kallens' actual and constructive knowledge of the existence of the Association to distinguish *Deep Meadows*. (Association's Br. at 49.)

Finally, the Association asserts that the trial court's order contravenes the purpose of a planned community and deprives other property owners in the development of the benefit of uniform application of the covenants. Based upon Ricker's "possible technical foul of over-recording identical covenants at different times," the Association asserts, "the trial court absolved the Kadar-Kallens from compliance obligations such that they may violate the [c]ovenants with impunity and thereby directly affect all other unit owners." *Id.* at 51. The Association further cautions that the trial court's reasoning possibly could apply to other similarly situated property owners in Old Iron Estates, and it thus forecasts a "logistical nightmare" in attempting to determine which properties are governed by the Association and which are bound by covenants. *Id.* at 52.

10

The Kadar-Kallens view the Phase I Covenants very differently. They note that the Phase I Covenants facially apply to "P/O" or "parts of" tax parcel numbers 35-066-008 and 35-066-013, and refer only to Phase I Plan, not to any other phase of the development. (Kadar-Kallens' Br. at 4.) Where the Association stresses the portions of the Phase I Covenants that indicate their applicability to "all land" and "each and every unit" within Old Iron Estates, the Kadar-Kallens emphasize the remainder of the language. They highlight that the Phase I Covenants apply to "all land included within the Planned Community as described on the Final Subdivision Plan for Old Iron Estates . . . dated March 20, 2002, revised February 18, 2003 *and* recorded with the Office of the Recorder of Deeds of Dauphin County in Plan Book "O", Volume 8, Pages 22-26 . . . ." *Id.* (Kadar-Kallens' emphasis). The use of the conjunctive ("and"), in the Kadar-Kallens' view, suggests that the Phase I Covenants apply only to the properties described in the plans that were recorded at the designated book, volume, and page numbers. The Phase I Plan is the only document recorded in Plan Book "O", Volume 8, Pages 22-26, and no other plans for any other phase were recorded elsewhere at that time. *Id.* The Kadar-Kallens further dispute the Association's assertion that the Phase I Plan describes the entirety of the future development. Rather, the Phase I Plan states that it covers 26 building lots, which represents only part of the approximately 90 acres that ultimately would be included in the development. *Id.* at 5. The Kadar-Kallens further note that the Phase I Covenants contain no additional description of real estate that would be included in future phases and, thus, there is no indication that they apply to any property located outside of the Phase I Plan. *Id.*

The Kadar-Kallens assert that the Phase I Covenants not only failed to establish a planned community with respect to properties located in Phase III, but that they were also defective in general and, thus, void *ab initio*. They note that, under the

11

UPCA, a declaration establishing a planned community must contain 17 enumerated items. *Id.* at 6-8 (quoting 68 Pa.C.S. §5205). The UPCA also sets forth a total of 18 requirements for the plats and plans that describe the planned community and requires a certification on the first page stating that all of the required information is included. *Id.* at 8 (citing 68 Pa.C.S. §5210). The Kadar-Kallens assert that the Phase I Plan and Phase I Covenants do not contain all of the information required under Sections 5205 and 5210 and, thus, that they failed to establish a planned community as a matter of law. *Id.* at 9.[7]

The Kadar-Kallens dispute the Association's invocation of contract principles and its reliance upon Ricker's presumed intent, and they focus instead upon the UPCA's requirements for creating a planned community, which they assert were not satisfied in this case. They further challenge the Association's reliance upon common law principles, and stress that the UPCA allows for the application of common law only to the extent that it is consistent with the UPCA's mandates. *Id.* at 11-12 (citing 68 Pa.C.S. §6108 (providing that common law principles "supplement the provisions of [the UPCA], except to the extent inconsistent with [the UPCA]")).

_____

[7] In reply, the Association challenges the Kadar-Kallens' view that compliance with Sections 5205 and 5210 is a prerequisite to the establishment of a planned community. Rather, the Association quotes the Uniform Law Comment to Section 5201, which states that "[a] planned community has not been lawfully created unless the requirements of *this section* have been complied with." (Association's Reply Br. at 5 (quoting 68 Pa.C.S. §5201 cmt. 3) (Association's emphasis).) Section 5201, the Association contends, requires only a declaration executed by all persons with an interest in the subject property and recording of the declaration in the proper county or counties. *Id.* (citing 68 Pa.C.S. §5201). The Association thus contends that the Kadar-Kallens conflate the requirements for the *creation* of a planned community with the necessary *contents* of the declaration. *Id.* at 4. Thus, in the Association's view, even if the Phase I Covenants failed to include all of the information required by statute, this omission should not result in a finding that a planned community was never created. As discussed below, because we are here concerned only with the subject Property, we find it unnecessary to address the question of whether the Phase I Covenants were sufficient to create a planned community with respect to any other real estate in the development.

12

Because the Kadar-Kallens assert that the Phase I Plan and Phase I Covenants failed to comply with the UPCA, they argue that the Association can find no safe harbor under common law.

With regard to the Phase III Covenants recorded in 2012, the Kadar-Kallens first argue that they could not establish a planned community with respect to the Property because Ricker had no ownership interest in the Property at that time. *Id.* at 12. In any event, the Kadar-Kallens assert that the Phase III Covenants were defective for the same reasons that the Phase I Covenants were defective, in that they failed to include all the information required by statute. *Id.* at 13-14. Further, in the Kadar-Kallens' view, Ricker's recording of the Phase III Covenants in 2012 belies the Association's position that the Property is subject to the Phase I Covenants, for if that was the case, then there was no need for Ricker to record a separate document pertaining to Phase III. *Id.* at 15. To the extent that the Association below characterized the Phase III Covenants as a mere amendment to the Phase I Covenants, the Kadar-Kallens echo the trial court's observation that there is no evidence suggesting that the Association followed the UPCA's procedure for amending a declaration. *Id.* at 15-16 (citing 68 Pa.C.S. §5219 (relating to amendment of declarations)).

The Kadar-Kallens do not dispute the Association's evidence suggesting their notice that a homeowners' association existed when they purchased the Property.[8] Rather, they essentially contend that such notice was irrelevant because the Association's "argument presupposes that a planned community validly existed, of

---

[8] The Kadar-Kallens do challenge the Association's characterization of their title report. The Association emphasizes that the title report identified the Phase I Covenants, but the Kadar-Kallens point out that the report also states that title insurance company "did not find any restrictions for Phase III." (Kadar-Kallens' Br. at 17, 20; Association's Cross-Motion for Summary Judgment, Exhibit 6; R.R. at 242a.)

which the Property was part, as of 2007 when the Kadar-Kallens purchased the Property." *Id.* at 20. Regardless, the Kadar-Kallens stress that their chain of title contained no mention of the Association or its covenants, as there is no such reference in their deed or in their predecessors' deeds. *Id.* at 19. The Kadar-Kallens argue that their situation is therefore analogous to the circumstance at issue in *Deep Meadows*, which, in their view, the trial court correctly applied to conclude that they are not bound by the Phase I or Phase III Covenants. For similar reasons, the Kadar-Kallens contend that they are not obligated to pay annual fees to the Association. Like the homeowner in *Deep Meadows*, they note that their deed conveys no right to use common areas in the development and, accordingly, they are not liable for a share of the maintenance costs for such common areas.

Finally, rebutting the Association's reliance upon public policy considerations relating to the purpose of planned communities, the Kadar-Kallens invoke countervailing policy considerations. They note that the law disfavors restrictive covenants that interfere with property owners' free use and enjoyment of their properties. *Id.* at 25 (citing *Mishkin v. Temple Beth El of Lancaster*, 239 A.2d 800, 803 (Pa. 1968)). Moreover, granting the Association's requested relief, the Kadar-Kallens warn, "would amount to giving developers the unfettered right to bind unsuspecting homeowners to onerous covenants years after the homeowner purchases the property." *Id.* In response to the Association's concerns for the uncertain status of other properties in the development, the Kadar-Kallens suggest that nothing in the trial court's decision precludes homeowners from voluntarily contributing to the upkeep of common areas or from agreeing to maintain their properties in a certain way. *Id.* at 26.

14

## B. Analysis

At the outset, the parties no longer appear to differ as to whether the Phase III Covenants sufficed to bind the Property to their terms or to establish a planned community that includes the Property. The UPCA provides that "a planned community may be created . . . only by recording a declaration executed in the same manner as a deed *by all persons whose interests in the real estate will be conveyed to unit owners . . . .*" 68 Pa.C.S. §5201 (emphasis added). Because Ricker sold the Property in 2005, he had no ownership interest in the Property in 2012. Thus, at the time that he recorded the Phase III Covenants, the Property was not Ricker's to encumber.

Accordingly, the question becomes whether the Phase I Plan and Phase I Covenants were sufficient to achieve the result that the Association seeks. To answer this question, we must consider both the provisions of the UPCA and our previous decisions addressing similar factual scenarios.

The UPCA defines a "planned community," in relevant part, as:

> Real estate with respect to which a person, by virtue of ownership of an interest in any portion of the real estate, is or may become obligated by covenant, easement or agreement imposed on the owner's interest to pay any amount for real property taxes, insurance, maintenance, repair, improvement, management, administration or regulation of any part of the real estate other than the portion or interest owned solely by the person.

68 Pa.C.S. §5103. "In simpler terms," our Supreme Court has explained, "a planned community is an area of land consisting of homes that are individually owned as well as common areas that are owned or leased by an association consisting of all of the homeowners in the community." *Saw Creek Community Association, Inc. v. County of Pike*, 866 A.2d 260, 263 (Pa. 2005).

15

A "declaration" is "[a]ny instrument, however denominated, that creates a planned community and any amendment to that instrument." 68 Pa.C.S. §5103. As noted above, a planned community is created "only by recording a declaration executed in the same manner as a deed by all persons whose interests in the real estate will be conveyed to unit owners," and such declaration "must be recorded in every county in which any portion of the planned community is located, must be indexed in the same records as are notarized for the recording of a deed and shall identify each declarant as the grantor and the name of the planned community as grantee." *Id.* §5201.

Old Iron Estates is located in Dauphin County, and the Phase I Covenants were recorded with the Dauphin County Recorder of Deeds. The Phase I Covenants contain provisions relating to the maintenance and upkeep of common facilities, state that such is the responsibility of the Association, and require unit owners to contribute to the Association's expenses via an initial payment of $200 and an annual fee of $100.[9] The Phase I Covenants, thus, impose an obligation upon unit owners, "by virtue of ownership of an interest in any portion of the real estate," to "pay [an] amount for real property taxes, insurance, maintenance, repair, improvement, management, administration or regulation" of a "part of the real estate other than the portion or interest owned solely by the person." 68 Pa.C.S. §5103.

As the Kadar-Kallens emphasize, Sections 5205 and 5210 set forth numerous items to be included in the declaration and the plats and plans. 68 Pa.C.S. §§ 5205, 5210. We appreciate the purpose of the Kadar-Kallens' argument that the Phase I Plan and Phase I Covenants were defective under the UPCA, having failed to

---

[9] The Phase I Covenants provide that: "[c]are, maintenance and upkeep of the Controlled and Common Facilities . . . shall be the responsibility of the [Association]. A $200 fee at the purchase of lot will be charged. A $100 per year fee or part thereof will be charged. This $100 per year fee may be raised or lowered to pay expenses of [the Association]." (Phase I Covenants at Section III(B).)

16

include certain pieces of information required by these sections. Nonetheless, we find it unnecessary to consider whether the Phase I Covenants thereby failed to establish a planned community in the first place, as the Kadar-Kallens contend. Here, we are concerned only with the fate of the Property that is the subject of this litigation. The validity or effectiveness of the Phase I Covenants as they apply to any other real estate in the development, or to any other phase thereof, is beyond the scope of this decision. For purposes of this decision, we conclude that the Phase I Covenants constitute a "declaration" under the UPCA.

Notably, however, the UPCA provides a procedure for phased implementation of a development, as Ricker sought to do here, via the creation of a "flexible planned community." This term is defined in the UPCA as "[a] planned community containing withdrawable or convertible real estate or a planned community to which additional real estate may be added or a combination thereof." 68 Pa.C.S. §5103. "Additional real estate," in turn, is defined as "[r]eal estate that may be added to a planned community." *Id.* A declarant has the ability to add real estate to the planned community through the reservation of "development rights," which are defined, in relevant part, as "[a]ny right or combination of rights reserved by a declarant in the declaration . . . to add real estate to a planned community." *Id.* The Uniform Law Comment to the latter definition provides that "development rights" include techniques that "relate to the phased (or incremental) development of planned communities which the declarant hopes, but cannot be sure, will be successful enough to grow to include more had than he is initially willing to commit to the planned community." *Id.*, cmt. 7. The creation of such a community requires that the declaration include "[a]n explicit reservation of any options to create units, limited

17

common elements or both within convertible real estate or to add additional real estate to or withdraw withdrawable real estate from the planned community." *Id.* §5206(1).

Turning to the Phase I Covenants themselves, we find that the language unambiguously refers only to Phase I of the development. The Association selectively quotes portions of the introductory language stating that the Phase I Covenants apply to "all land included within the Planned Community" and to "each and every" unit therein, but the Association disregards a clear limitation upon their scope. The Phase I Covenants plainly state that they are binding "upon all land included within the Planned Community *as described* on the Final Subdivision Plan for Old Iron Estates, Lower Paxton Township, Dauphin County, dated March 20, 2002, revised February 18, 2003 and recorded with the Office of the Recorder of Deeds of Dauphin County *in Plan Book "O", Volume 8, Pages 22-26*, inclusive, *for Phase I . . . .*" (Phase I Covenants at 1 (emphasis added).) The referenced plan is the Phase I Plan. The Phase I Plan does include a single reference to a broader tract of land than is described, but it details only the 31 lots that are included within Phase I. Quite simply, the Phase I Plan is the plan for Phase I, not for Phase II, Phase III, or Phase IV. The plans for the latter phases were separately recorded after Ricker's execution of the Phase I Covenants. Significantly, in the Phase I Covenants, Ricker did not reserve any "development right" to "add additional real estate to . . . the planned community." 68 Pa.C.S. §5206.

The Property is described as Lot 41 in Phase III of the development. There is no indication in the Phase I Plan that the Property is included therein. The Phase I Covenants do not state that they apply to Phase III, but rather only to Phase I. Moreover, the Phase I Covenants include no reservation of the right to add the Property to the planned community that they created. Accordingly, we conclude that pursuant to the plain language of the Phase I Covenants, the Property is not bound thereby. This

18

conclusion is bolstered by the very fact that Ricker later elected to record the Phase III Covenants. If a reasonable reading of the Phase I Covenants allowed for the Property's inclusion therein, then there would be no basis to later record separate covenants pertaining to the Property. Although the Association characterizes Ricker's recording of the Phase III Covenants as merely a "possible technical foul" done for the sake of "an abundance of caution," it evidences the fact that not even Ricker believed that the Phase I Covenants were alone sufficient to bind the Property. (Association's Br. at 47, 51.) If there was a technical foul, it was Ricker's failure to observe the UPCA's procedures for the phased implementation of a planned community through the reservation of a development right to add additional real estate thereto. *See* 68 Pa.C.S. §§5103, 5206.

Although we conclude that the Property is not bound by the language of the Phase I Covenants or the Phase III Covenants, this does not end our inquiry. The parties stress numerous facts and circumstances that bear a resemblance to previous decisions addressing similar issues, particularly as they relate to the Association's contention that, regardless of whether the Kadar-Kallens are bound by restrictive covenants upon the Property, they nonetheless remain obligated to pay the Association's fees for the maintenance of common areas in the development. Both the parties and the trial court relied upon our decision in *Deep Meadows*, and each party presently contends that *Deep Meadows* supports its respective position. *Deep Meadows* itself, however, was guided by a series of previous decisions addressing "the ability of homeowners' associations to impose fees in the absence of express authority to do so." *Deep Meadows*, 140 A.3d at 64. In order to place both *Deep Meadows* and the instant case in proper context, we must review those same precedents.

In *Meadow Run*, property owners sought review of a trial court decision holding that a homeowners' association had authority to impose fees for the maintenance of roads, dams and other common facilities. Although the property owners previously had contributed to the association voluntarily, they objected when the association sought to impose a mandatory assessment of $300 per year, contending that no such obligation appeared in their deeds. The Superior Court noted that homeowners' associations are "analogous to mini-governments" and that they are "dependent on the collection of assessments to maintain and provide essential and recreational facilities." *Meadow Run*, 598 A.2d at 1026. "When ownership of property within a residential community allows the owners to utilize roads and other common areas of the development, there is an impl[i]ed agreement to accept the proportionate costs for maintaining and repairing these facilities." *Id.* (citing *Sea Gate Association v. Fleischer*, 211 N.Y.S.2d 767 (N.Y. Sup. Ct. 1960)).

The *Meadow Run* Court acknowledged that the property owners' deed did "not explicitly spell out the exact obligation of the lot owners with regard to payment of dues for maintenance and repairs," but it found that "the deed is not wholly silent as to the matter either." *Id.* A deed covenant provided:

> In the event of the formation or incorporation of an association of the lot owners on above mentioned plot of Mountain and Meadow Run Lakes, the occupants of the above described premises shall be bound by such rules and regulations concerning the use of Mountain and Meadow Run Lakes as to boating, bathing, ice skating and fishing, as may be duly formulated and adopted by such association or incorporation.

*Id.* Because the property owners' deed granted them a right to use the common facilities and placed them on notice that they would be subject to the association's rules

concerning those facilities, the *Meadow Run* Court concluded that the association was authorized to assess fees for the cost of maintaining them. The Court held that:

> [A]bsent an express agreement prohibiting assessments, when an association of property owners in a private development is referred to in the chain of title and has the authority to regulate each property owner's use of common facilities, inherent in that authority is the ability to impose reasonable assessments on the property owners to fund the maintenance of those facilities.

*Id.* at 1027.

In *Fogarty*, property owners challenged a community association's authority to impose special assessments for the construction of three capital improvements that were not expressly authorized by deed covenants or the community association's bylaws. The property owners' deed, however, required them to be members of the association and "to pay annual dues and fees, as well as assessments for control, maintenance and repair of streets, roads and recreational facilities." *Fogarty*, 685 A.2d at 242. This Court noted that all property owners would benefit from the improvements and that, although their deed did not mention any assessment for such improvements, it also did not impose restrictions upon the association's authority to construct them. *Id.* at 244. Relying upon *Meadow Run*, the *Fogarty* Court held that, "absent language in the deed covenant prohibiting [the association] from levying special assessments for capital improvements," the property owners "may be assessed their proportionate costs to construct the new improvements." *Id.*

We addressed another challenge to the authority of a homeowners' association to impose assessments in *Spinnler Point*. There, unlike in *Meadow Run* and *Fogarty*, the property owners' deed contained no reference to a homeowners' association. *Spinnler Point*, 689 A.2d at 1028. However, their deed did afford them

21

the right to use the development's roads and to access a lake within the community. Again invoking *Meadow Run*, this Court held that "a property owner who purchases property in a private residential development who has the right to travel the development roads and to access the waters of a lake is obligated to pay a proportionate share for repair, upkeep and maintenance of the development's roads, facilities and amenities." *Id.* at 1029.

In *Hess*, several property owners challenged a homeowners' association's assessments. The association owned and maintained various amenities, including a lake and a park. With the exception of one property owner, Lee Crowell, all of the property owners' deeds referenced a homeowners' association, granted them rights to access the lake and the park, and mandated their payment of $30 per year for such rights. Crowell's deed was silent as to these matters. The property owners did not challenge the $30 annual assessment, but objected to an additional $200 annual assessment that the association imposed to cover the costs of maintenance of other common areas in the community. Citing *Meadow Run*, *Fogarty*, and *Spinnler Point*, this Court found the additional $200 assessment permissible because, notwithstanding the specific provision in the deeds relating to the lake and the park, "the [a]ssociation may nonetheless assess the [o]wners a proportionate share of the costs of maintaining all the common areas" in the development. *Hess*, 718 A.2d at 913. Even Crowell, whose chain of title did not reference the association, was liable for a proportionate share of the maintenance costs of the common facilities. We found Crowell's circumstance analogous to *Spinnler Point*, in which the property owners' entitlement to use common facilities triggered an obligation to contribute to the costs to maintain them, notwithstanding the absence of a reference to a homeowners' association in the property owners' chain of title. *Id.*

22

The property owners in *Hess* further argued that membership in the association was optional and, therefore, that they had no absolute right to use the community's common facilities, and no corresponding obligation to contribute to their maintenance. Rejecting this position, the *Hess* Court noted that the property owners previously had entered into a settlement with the association that expressly granted them an easement for "the use, liberty and privilege of, and passage in and to the roads, amenities and common facilities" that belonged to the association. *Id.* at 914. Notwithstanding the absence of the settlement from the property owners' chains of title, we found that "any owner may nevertheless demand access to all the common areas on the ground that each owner has an easement for use of the commons as evidenced in the settlement agreement." *Id.*

*Huddleson v. Lake Watawga Property Owners Association*, 76 A.3d 68 (Pa. Cmwlth. 2013), implicated a similar issue. The issue in *Huddleson* involved a homeowner's challenge to a homeowners' association's amendments to its constitution and bylaws, which made membership mandatory and pursuant to which the association sought to collect dues and late fees from the homeowner. The homeowner asserted that the amendments were invalid because she did not consent to be bound by them. In concluding that the homeowner was not liable for the association's assessments, this Court distinguished the above-discussed precedents as follows:

> There is no dispute that [the homeowner] did not give her consent, so the only issue is whether she has an interest that obligated her to pay dues or assessments to the [a]ssociation. In *Spinnler Point*, 689 A.2d at 1029, we held that "a property owner who purchases property in a private residential development who has the right to travel the development roads and to access the waters of a lake is obligated to pay a proportionate share for repair, upkeep and maintenance of the development's roads, facilities and amenities." Further, we have held that "[e]ven if an owner's chain of title makes

23

no reference to a homeowners' association, we have held that the owner is nonetheless obligated to pay a share of the costs of maintaining common areas managed by a homeowners' association . . . ." *Hess*, 718 A.2d at 912.

Unlike in *Spinnler Point* and *Hess*, [the homeowner] has no interest in the development roads requiring her to pay for common improvements. There is nothing in her deed that imposes any obligation upon her to maintain any property that the [a]ssociation maintains. She is not obligated to maintain the private road because she does not abut it and has no legal right to use it, her access being from a public road. While she does have Lake access, the Pocono Association is the owner of the Lake, not the [a]ssociation, and any contributions by the [a]ssociation to the Pocono Association are voluntary. Moreover, there is nothing in the Nonprofit Corporation Law that gives it the right to bind non-members or make membership mandatory absent a shared obligation.

*Id.* at 73 (citations modified).

As the parties to the instant case recognize, the facts here bear a significant resemblance to those at issue in *Deep Meadows*. In that case, a homeowners' association brought an action against a homeowner, Edward Trusello, for nonpayment of fees. The association asserted that the fees were meant to cover the costs of insurance and lawn care for a parcel of open area in the community, as well as to cover the post office box and business costs. *Deep Meadows*, 140 A.3d at 62. Trusello's deed contained no reference to a homeowners' association, provided no right to use the open area, and included no obligation upon Trusello to pay fees for the benefit of that use. *Id.* Trusello's property, moreover, was located on the outer edge of the development, and he accessed it through public roads, not the development's roads. *Id.* Accordingly, in order to access the open area, "Trusello would either have to walk across his neighbor's property, or travel from his [p]roperty on a public road, turn onto another public road, enter the [d]evelopment's entrance and walk across an unmarked

path between two private homes." *Id.* Moreover, Trusello argued that he was not liable to the association because the association's bylaws were not recorded or made available in the public record until over 13 years after he purchased his property, and because he never agreed to them. *Id.* Trusello further asserted that he had no notice of the association's existence when he purchased his property, that he never agreed to be a member, and that he received no benefit from the association. *Id.*

The recorded plan for the development did not establish a homeowners' association. *Id.* However, the plan depicted the open area and included a notation that the "open area [is] to be dedicated to Deep Meadows Civic Association." *Id.* at 63 (capitalization modified). The recorded plan, however, did "not include any additional information concerning the [a]ssociation's existence, its purpose, the content or location of its bylaws, or information regarding its membership requirements." *Id.*

The trial court ruled for Trusello, finding that he was not liable for the association's annual fees. After a thorough review of *Meadow Run*, *Fogarty*, *Spinnler Point*, *Hess*, and *Huddleson*, this Court agreed with the trial court. Unlike the homeowners in *Meadow Run* and *Fogarty*, Trusello's deed contained no reference to a homeowners' association, and he had no notice at the time he purchased his property that it was or may become subject to such an association. *Id.* at 68. Although the homeowner's deed in *Spinnler Point* also contained no such reference, it afforded the homeowner there an express right to use common property. Trusello's deed, by contrast, "afforded him no right to use any common property." *Id.* *Hess* was similarly distinguishable due to the settlement agreement that expressly conveyed to the property owners a right to use common areas. *Id.* We found the circumstance most similar to *Huddleson*:

> Here, as in *Huddleson*, "there is nothing in [the d]eed that imposes any obligation upon [Trusello] to maintain any

25

property that the association maintains[,]" and there is nothing in the deed conveying to Trusello the right to use the common areas. *Huddleson*, 76 A.3d at 73. Nor is there any indication in the deed that the property would be subject to a homeowners' association. In fact, the only reference to "Deep Meadows" in the deed is a reference to the subject lot on the Plan. Although the Plan identifies the open area as "Open Area to be Dedicated to Deep Meadows Civic Association," it does not provide any indication of the proposed use for the open area, or provide any information regarding the purpose or function of the association. Further, information about the association was not publicly[] accessible since it did not register its bylaws until more than 13 years after Trusello purchased the property. Given these considerations, along with the property's location on the outer edge of the development, accessible from public roads and inaccessible from the development's roads, the trial court properly found that Trusello had neither actual nor constructive notice that the [p]roperty was subject to a homeowner's association. *See Rybarchyk v. Pocono Summit Lake Property Owners Association, Inc.*, 49 A.3d 31 (Pa. Cmwlth. 2012).

*Id.* at 68-69 (citations and capitalization modified; record citation and footnotes omitted).

Finally, we rejected the association's argument that Trusello should be obligated to pay fees for the upkeep of the open area due to the benefits that he derived therefrom. The trial court had specifically rejected the association's contention that Trusello enjoyed the lack of noise generated by the open area, and no other evidence that Trusello benefitted from the open area appeared in the record. Given the trial court's rejection of that asserted benefit, coupled with Trusello's apparent lack of access to the open area, we concluded that Trusello did not benefit from the open area, so as to trigger an obligation to contribute to its maintenance. *Id.* at 69. Accordingly, we held that Trusello was not liable to the association for its annual fees. *Id.*

26

Returning to the instant case, here the Kadar-Kallens' deed, like Trusello's, contains neither a reference to a homeowners' association nor any right to use common areas in Old Iron Estates. (Kadar-Kallens' Motion for Summary Judgment, Exhibit K; R.R. at 102a-04a.) The deed through which Ricker conveyed the Property to the Kadar-Kallens' predecessor, Fox, also includes no such provisions. (Kadar-Kallens' Motion for Summary Judgment, Exhibit J; R.R. at 98a-100a.) Accordingly, the instant case is distinguishable from *Meadow Run*, *Fogarty*, *Spinnler Point*, and *Hess*, all of which involved either a deed's express reference to a homeowners' association or an express grant of the right to use common facilities in the community. The absence of such provisions here resembles the circumstances in *Huddleson* and *Deep Meadows*.

The Phase I Plan contains a reference to a homeowners' association, and states that it would be responsible for maintaining Lot 58 and the medians described in the Phase I Plan. Like the dedication of the open area to the association in *Deep Meadows*, this is not dispositive, particularly where the Phase I Plan does "not include any additional information concerning the Association's existence, its purpose, the content or location of its bylaws, or information regarding its membership requirements." *Deep Meadows*, 140 A.3d at 63. Moreover, like the association's bylaws in *Deep Meadows*, which were enacted over 13 years after Trusello purchased his property, *id.* at 62, the Association here states that it adopted its bylaws at its first annual meeting on November 15, 2016, over 9 years after the Kadar-Kallens purchased the Property. (Association's Br. at 16; *see also* Association's Cross-Motion for Summary Judgment, Exhibit 7 (Association's Amended Bylaws dated June 14, 2017); R.R. at 245a-73a.)

All of these circumstances weigh in favor of the Kadar-Kallens. The principal complication and potential distinguishing feature of this case is that, in *Deep Meadows*, we concluded that Trusello had "had neither actual nor constructive notice that the [p]roperty was subject to a homeowner's association." *Deep Meadows*, 140 A.3d at 68-69. As the Association stresses, in this case there was ample evidence demonstrating the Kadar-Kallens' notice that there was a homeowners' association in Old Iron Estates. Their actual notice of the Association, however, was premised upon the belief that the Property is subject to the Phase I Covenants. As discussed above, the plain language of the Phase I Covenants reveals that they do not apply to the Property, and the Phase III Covenants did not exist at the time. As such, in 2007 when the Kadar-Kallens purchased the Property, it was not "subject to a homeowners' association." *Id.* The Kadar-Kallens had notice of an entity that, for purposes of their Property, did not exist. Had Ricker complied with the UPCA's procedure for establishing a flexible planned community and reserved the right to add the Property thereto, the result may have been very different. But none of the documents that the Kadar-Kallens executed when they purchased the Property were capable of altering the language of the Phase I Covenants.

A final relevant consideration is whether a homeowner derives any benefit from the homeowners' association or its common facilities, so as to trigger an obligation to contribute to the costs of their maintenance regardless of the homeowner's membership in the association or any express deed provision relating thereto. *Deep Meadows*, for instance, included a fact-intensive analysis of whether Trusello enjoyed any of the benefits provided by the community's open area, and we concluded that he did not. *Deep Meadows*, 140 A.3d at 69. Our Superior Court's decision in *Wag-Myr Woodlands* is also instructive on this point.

28

In that case, a homeowners' association brought an action against non-member property owners to recover fees for the maintenance of a road by which they accessed their properties, based upon language in their deeds granting them an easement across the road. *Wag-Myr Woodlands*, 197 A.3d at 1247. The property owners' deeds did not refer to the existence or future establishment of a homeowners' association. *Id.*[10] After the association took ownership of the road from the developer and assumed responsibility for its maintenance, it sought to collect fees from all of the property owners, who objected on the basis that the association formed after they purchased their properties, and they were not required to become members thereof. The property owners conceded that they were obligated to maintain the portion of the road that directly abutted their respective properties, but challenged the imposition of a fee by the association. *Id.* at 1251-52. The property owners relied upon *Deep Meadows*, but the Superior Court distinguished *Deep Meadows* based upon the express easement granted by the property owners' deeds, which was lacking in *Deep Meadows*. *Id.* at 1254. The Court held that the easement "alone obligates the [property owners] to pay a 'proportionate share' of the maintenance costs" of the road. *Id.* (citing *Spinnler Point*, 689 A.2d at 1029). This was the case notwithstanding the fact that the property owners were not members of the homeowners' association. To the extent that the property owners challenged their obligation to pay fees to the particular association because it did not exist when they purchased their properties, the Superior Court noted that the association was the successor in interest to the original developer, which had granted the easement to the property owners. *Id.* at 1255. Thus, the association was

---

[10] One property owner's deed in *Wag-Myr Woodlands* referred to the future establishment of a homeowners' association, and the Superior Court analyzed that party's obligations separately. *Wag-Myr Woodlands*, 197 A.3d at 1247, 1255-56. The remaining property owners' deeds were silent as to the existence of a homeowners' association. Because the Kadar-Kallens' deed is likewise silent on the matter, we will not discuss the analysis that was unique to the former property owner.

"the servient owner to which [the property owners] are required to pay their 'proportionate share' for the maintenance" of the road. *Id.*

We find that the record in the instant case is not sufficiently developed to determine whether the Kadar-Kallens may be obligated to pay a "proportionate share," *id.* at 1254, of the maintenance costs for any portion of Old Iron Estates. The parties appear to differ as to whether the Kadar-Kallens benefit from the Association's maintenance of common areas in the development. In both its cross-motion for summary judgment and its motion for reconsideration, the Association asserted that, regardless of their membership in the Association, the Kadar-Kallens are obligated to pay fees due to the benefits that they receive from the Association's maintenance of common areas. (Association's Cross-Motion for Summary Judgment ¶22 (averring that the Kadar-Kallens benefit from the Association's "maintenance of common elements and other activity"); Association's Motion for Reconsideration ¶12 (arguing that Kadar-Kallens remain obligated to pay Association's fees for "common area management and maintenance"); R.R. at 218a, 339a.) The Association's averments are rather nonspecific. It has not established that the Kadar-Kallens actually use any particular common areas, and it does not detail any specific benefit that they might derive from them. The Kadar-Kallens, for their part, assert that they are not obligated to pay any fees to the Association because they have no right to use any common facilities, inasmuch as their deed provides no such right. (Kadar-Kallens' Answer to Motion for Reconsideration ¶7; R.R. at 345a.)[11] We note, however, that the Kadar-

---

[11] To the extent that the Kadar-Kallens maintain that the UPCA does not require them to pay annual assessments to the Association for any year in which the Association did not adopt an annual budget, Kadar-Kallens' Br. at 23 (citing 68 Pa.C.S. §5314(a)), we note that this consideration was not deemed dispositive in any of the above-discussed precedents concerning the obligation of homeowners to contribute to a homeowners' association's costs to maintain common areas, even those decided well after the enactment of the UPCA, such as *Deep Meadows* and *Wag-Myr* **(Footnote continued on next page…)**

Kallens have paid fees to the Association in the past, as evidenced by the check that the Association produced in support of its cross-motion for summary judgment, demonstrating the Kadar-Kallens' payment of a $200 fee to the Association on February 28, 2007. (Association's Cross-Motion for Summary Judgment, Exhibit 2; R.R. at 225a.)

In granting summary judgment in favor of the Kadar-Kallens, and simultaneously denying the Association's cross-motion for summary judgment, the trial court did not address certain fact-specific considerations that may affect the analysis. Rather, the trial court appeared to conclude that, because the Phase I Covenants do not apply to the Property, because they thus are not members of the Association, and because the Kadar-Kallens' deed does not reference an obligation to pay assessments to the Association, the Kadar-Kallens could not be required to pay any amount to the Association for the maintenance of common areas. However, the homeowners in *Wag-Myr Woodlands* were not members of the association, yet the Superior Court held that they nonetheless were obligated to pay their "proportionate share" of the association's costs to maintain the road by which they accessed their properties. *Wag-Myr Woodlands*, 197 A.3d at 1254. In *Deep Meadows*, Trusello's deed did not contain any reference to a homeowners' association and did not obligate him to pay fees thereto, yet this Court also engaged in a fact-intensive analysis of whether the common area at issue was accessible to Trusello and whether the record established any benefit that he derived from it. *Deep Meadows*, 140 A.3d at 69.

_Woodlands_. Moreover, in *Wag-Myr Woodlands*, the Superior Court did not require the homeowners to pay the exact sum assessed by the association for its annual fee, but rather, remanded for a calculation of each homeowner's "proportionate share" of the costs to maintain the road. *Wag-Myr Woodlands*, 197 A.3d at 1255. This determination was not based upon the existence or nonexistence of an annual budget, but upon the equitable consideration that "beneficial users of the common areas of [a] development[] are responsible for the costs of maintenance of such facilities." *Id.* at 1253 (quoting *Meadow Run*, 598 A.2d at 1027) (bracketed material in original).

Accordingly, the trial court's conclusions were not alone sufficient to dispose of this issue as a matter of law, because there are other facts that bear upon the question of whether the Kadar-Kallens may be obligated to contribute to the Association's costs to maintain common areas in Old Iron Estates.

The Kadar-Kallens are correct that their deed does not grant them any express right to use any common areas in Old Iron Estates. However, on the record before us, we cannot determine whether they actually use such areas, or whether they have used such areas in the past. Indeed, given the generality of the averments, we do not know which particular common areas are even at issue, where they are located within the development, or what benefits the Kadar-Kallens may or may not derive from them. *Cf. Deep Meadows*, 140 A.3d at 69 (rejecting association's argument that Trusello could access the open area and that he benefitted from the quiet that it created). Moreover, apart from any use of an open lot or common facility, a benefit potentially could derive from, for example, the Kadar-Kallens' use of roads to access the Property. This was a significant consideration in cases such as *Huddleson* and *Wag-Myr Woodlands*. However, the parties here have produced no evidence concerning the maintenance of the development's roads.[12]

Rule 1035.2 of the Pennsylvania Rules of Civil Procedure provides, in relevant part, that summary judgment is appropriate "whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report." Pa.R.C.P. No.

_____

[12] We note that the Phase I Plan contains a certification signed by Ricker stating that "all roads or streets shown hereon, if not previously dedicated, are hereby offered for public use." (Phase I Plan at 1.) We can locate no indication in the record as to whether any such roads were previously dedicated, or whether and to what extent the Association incurs costs to maintain them. The Phase I Covenants contain no express provisions relating to road maintenance. Thus, we can only speculate as to the identity of the individuals who maintain the roads' surfaces, or who perform services such as street cleaning, leaf and snow removal, etc.

1035.2(1). As it concerns the question of fees, we conclude that the record before us reveals an absence of facts material to the necessary analysis, which could be established by additional discovery. Accordingly, on this narrow issue, there is not a sufficient basis upon which to conclude that either party is entitled to summary judgment as a matter of law.

Thus, we affirm the portion of the trial court's order granting summary judgment in favor of the Kadar-Kallens to the extent that it concluded that the Property is not bound by the terms of the Phase I or Phase III Covenants. We vacate the trial court's order to the extent that the trial court concluded that the Kadar-Kallens are not obligated to pay any amount to the Association for the maintenance and upkeep of common facilities, and we remand for further development of this issue.

_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Michael A. Kadar-Kallen and      :
Kimberlee Kadar-Kallen      :
     :    No. 1671 C.D. 2019
     v.      :
     :
Old Iron Estates Homeowners      :
Association,      :
        Appellant      :

## *ORDER*

AND NOW, this 3rd day of December, 2020, the order of the Court of Common Pleas of Dauphin County is AFFIRMED in part and VACATED in part. The matter is REMANDED for further proceedings consistent with this Opinion. Jurisdiction relinquished.

_____
PATRICIA A. McCULLOUGH, Judge